## REINA *v.* UNITED STATES.

No. 29.   Argued November 7–8, 1960.—
Decided December 19, 1960.

*Allen S. Stim* argued the cause for petitioner. With him on the brief was *Menahem Stim.*

*Oscar H. Davis* argued the cause for the United States. On the briefs were *Solicitor General Rankin, Assistant Attorney General Wilkey, Beatrice Rosenberg, J. F. Bishop* and *Robert S. Erdahl.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The Narcotic Control Act of 1956,[1] 18 U. S. C. § 1406, legislates immunity from prosecution for a witness compelled under the section by court order to testify before a federal grand jury investigating alleged violations of the federal narcotics laws. The questions presented are, primarily, whether the section grants immunity from

[1] Act of July 18, 1956, 70 Stat. 572 *et seq.;* 18 U. S. C. § 1401 *et seq.* The relevant portions of § 1406 are as follows:

"§ 1406. Immunity of witnesses.

"Whenever in the judgment of a United States attorney the testimony of any witness . . . in any case or proceeding before any grand jury or court of the United States involving any violation of [certain federal narcotics statutes] . . . is necessary to the public interest, he, upon the approval of the Attorney General, shall make application to the court that the witness shall be instructed to testify . . . . But no such witness shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify . . . nor shall testimony so compelled be used as evidence in any criminal proceeding . . . against him in any court. . . ."

state, as well as federal, prosecution, and, if state immunity, whether the section is constitutional.

The petitioner was serving a five-year sentence for a federal narcotics offense [2] when, on December 5, 1958, he was subpoenaed before a federal grand jury sitting in the Southern District of New York. A number of questions were asked him concerning his crime, particularly as to the persons involved with him and their activities in the smuggling of narcotics into this country from Europe. The petitioner invoked the provision of the Fifth Amendment against being compelled to be a witness against himself [3] and refused to answer any of the questions. The United States Attorney with the approval of the Attorney General obtained a court order pursuant to § 1406 directing him to answer. When he returned before the grand jury he again refused to testify. Proceedings against him in criminal contempt resulted in the judgment under review adjudging him guilty as charged. 170 F. Supp. 592. The Court of Appeals for the Second Circuit affirmed. 273 F. 2d 234. Because of the importance of the questions of the construction and constitutionality of § 1406 raised by the case, we granted certiorari, 362 U. S. 939.

Petitioner's main argument in both courts below and here challenges § 1406 as granting him only federal immunity, and not state immunity, either because Congress meant the statute to be thus limited, or because the statute, if construed also to grant state immunity, would be unconstitutional. Both courts below passed the question whether the statute grants state immunity because,

---

[2] *United States* v. *Reina,* 242 F. 2d 302. When petitioner appeared before the grand jury on December 5, 1958, he had served about two years and eight months of his five-year term. He completed the sentence on November 21, 1959.

[3] "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

assuming only federal immunity is granted, they held that *United States* v. *Murdock,* 284 U. S. 141, settled that the Fifth Amendment does not protect a federal witness from answering questions which might incriminate him under state law. 170 F. Supp., at 595; 273 F. 2d, at 235. Petitioner contends that *Murdock* should be re-examined and overruled. We have no occasion to consider this contention, since in our view § 1406 constitutionally grants immunity from both federal and state prosecutions.

We consider first whether the immunity provided by § 1406 covers state, as well as federal, prosecutions. We have no doubt the section legislates immunity from both. The relevant words of the section have appeared in other immunity statutes and have been construed by this Court to cover both state and federal immunity. In *Adams* v. *Maryland,* 347 U. S. 179, a like provision in 18 U. S. C. § 3486 that the compelled testimony shall not "be used as evidence in *any* criminal proceeding . . . against him in *any* court" was held to cover both federal and state courts. (Emphasis supplied.) The "Language could be no plainer," p. 181. In *Ullmann* v. *United States,* 350 U. S. 422, 434–435, 18 U. S. C. § 3486 (c), added by the Immunity Act of 1954, of which § 1406 is virtually a carbon copy, was given the same construction. Moreover, the adoption of § 1406 followed close upon the *Ullmann* decision. That decision came down on March 26, 1956. Section 1406 was reported out of the House Ways and Means Committee only three months later on June 19, 1956, H. R. Rep. No. 2388, 84th Cong., 2d Sess. It became law on July 18, 1956. 70 Stat. 574. We cannot believe that Congress would have used in § 1406 the very words construed in *Ullmann* to cover both state and federal prosecutions without giving the words the same meaning.

We turn then to the petitioner's argument that, so construed, § 1406 encroaches on the police powers reserved

to the States under the Tenth Amendment. The petitioner recognizes that in *Ullmann* the Court upheld the authority of Congress to grant state immunity as "necessary and proper" to carry out the power to provide for the national defense; and in *Adams* v. *Maryland* upheld the power of Congress to preclude the States from using testimony that was compelled under former § 3486 before a congressional investigating committee. He insists, however, that the congressional authority to enact narcotics laws—rested on the Commerce Clause, *Brolan* v. *United States,* 236 U. S. 216, 218; *Yee Hem* v. *United States,* 268 U. S. 178; or the taxing power, *United States* v. *Doremus,* 249 U. S. 86; *Alston* v. *United States,* 274 U. S. 289; *Nigro* v. *United States,* 276 U. S. 332, 351–354; *United States* v. *Sanchez,* 340 U. S. 42—is not broad enough to encompass the legislation of immunity against state prosecution under state narcotics laws, "a subject that has traditionally been within the police power of the state." But the petitioner misconceives the reach of the principle applied in *Ullmann* and *Adams* v. *Maryland.* Congress may legislate immunity restricting the exercise of state power to the extent necessary and proper for the more effective exercise of a granted power, and distinctions based upon the particular granted power concerned have no support in the Constitution. See *Brown* v. *Walker,* 161 U. S. 591, in which the Court upheld a federal immunity statute passed in the name of the Commerce Clause and construed that statute to apply to state prosecutions. The relevant inquiry here is thus simply whether the legislated state immunity is necessary and proper to the more effective enforcement of the undoubted power to enact the narcotics laws.

It can hardly be questioned that Congress had a rational basis for supposing that the grant of state as well as federal immunity would aid in the detection of violations and hence the more effective enforcement of the narcotics

laws. The Congress has evinced serious and continuing concern over the alarming proportions to which the illicit narcotics traffic has grown. The traffic has far-reaching national and international roots. See S. Rep. No. 1997, 84th Cong., 2d Sess., pp. 3–6. The discovery and apprehension of those engaged in it present particularly difficult problems of law enforcement. The whole array of aids adopted in 1956, of which immunity is but one, was especially designed to "permit enforcement officers to operate more effectively." H. R. Rep. No. 2388, 84th Cong., 2d Sess., p. 10. The grant of both federal and state immunity is appropriate and conducive to that end, and that is enough. Even if the grant of immunity were viewed as not absolutely necessary to the execution of the congressional design, "[T]o undertake here to inquire into the degree of . . . necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground." *McCulloch* v. *Maryland,* 4 Wheat. 316, 423. And the supersession of state prosecution is not the less valid because the States have traditionally regulated the traffic in narcotics, although that fact has troubled one court. See *Tedesco* v. *United States,* 255 F. 2d 35. Madison said, "Interference with the power of the States was no constitutional criterion of the power of Congress. If the power was not given, Congress could not exercise it; if given, they might exercise it, although it should interfere with the laws, or even the Constitution of the States." II Annals of Cong. 1897 (1791). Or as the Court has said concerning federal immunity statutes, ". . . since Congress in the legitimate exercise of its powers enacts 'the supreme Law of the Land,' state courts are bound by [§ 1406], even though it affects their rules of practice." *Adams* v. *Maryland, supra,* p. 183.

The petitioner urges that in any event he should not have been ordered to answer the grand jury's questions

unless he first received a "general pardon or amnesty" covering the unserved portion of his sentence and his fine. This is a surprising contention, in light of the traditional purpose of immunity statutes to protect witnesses only as to the future. It suggests that the witness who has been convicted is entitled to ask more of the Government than the witness who has not but who may be compelled under § 1406 to reveal criminal conduct which, but for the immunity, would subject him to future federal or state prosecution. Yet the petitioner in his brief says that "the ordinary rule is that once a person is convicted of a crime, he no longer has the privilege against self-incrimination as he can no longer be incriminated by his testimony about said crime . . . ." There is indeed weighty authority for that proposition. *United States* v. *Romero,* 249 F. 2d 371; 8 Wigmore, Evidence (3d ed. 1940), § 2279; cf. *Brown* v. *Walker, supra,* 597–600. Under it, immunity, at least from federal prosecution, need not have been offered the petitioner at all.

The petitioner does not argue that remission of his penalty was his due as a *quid pro quo* for further exposing himself to personal disgrace or opprobrium. That reason would not be tenable under *Brown* v. *Walker, supra,* in which the Court rejected the argument that the validity of an immunity statute should depend upon whether it shields "the witness from the personal disgrace or opprobrium attaching to the exposure of his crime." 161 U. S., at 605. Nor does he support his contention with the argument that the prison sentence imposed for disobedience of the order directing him to testify is actually an additional punishment for his crime. His argument is the single one that the "said order was not a proper basis upon which to bottom a contempt proceeding in the face of a claim of privilege against self incrimination *as it did not grant this petitioner immunity coextensive with the*

*constitutional privilege it sought to replace . . . ."*
(Emphasis supplied.) The complete answer to this is
that in safeguarding him against future federal and state
prosecution "for or on account of any transaction, matter
or thing concerning which he is compelled" to testify, the
statute grants him immunity fully coextensive with the
constitutional privilege. Some language in *Brown* v.
*Walker,* 161 U. S., at 601, to which petitioner refers, com-
pares immunity statutes to the traditional declarations of
amnesty or pardon. But neither in that opinion nor else-
where is it suggested that immunity statutes, to escape
invalidity under the Fifth Amendment, need do more
than protect a witness from future prosecutions. This
§ 1406 does.

The petitioner complains finally that his sentence is
excessive. The District Court sentenced him to two
years' imprisonment to commence at the expiration of
the sentence he was then serving. However, the court
also allowed the petitioner 60 days from the date of the
judgment to purge himself of his contempt by appearing
within that period before the grand jury and answering
the questions. It was further provided that if he did so,
"the sentence imposed herein shall be vacated." The Dis-
trict Court took this action because it found in effect that
the petitioner asserted his legal position in good faith and
was not contumaciously disrespectful of the court's order
or obstinately flouting it. 170 F. Supp., at 596. There is
no occasion for us to consider the claim of excessiveness
of the sentence, or the petitioner's companion claim that
the conviction was invalid because the District Court did
not advise him of the extent of the immunity conferred
by § 1406. We construe the 60-day purge period as
running from the effective date of this Court's mandate
and the petitioner may avoid imprisonment by answering.
Now that this Court has held that his fears of future state

or federal prosecution are groundless, he knows that the only reason he gave for claiming his privilege has no substance. No question of an admixture of civil and criminal contempt having been raised below or here, we do not reach the issues it might present.

*Affirmed.*

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE concurs, dissenting.

The Court affirms a conviction for contempt of court upon which petitioner has been sentenced to imprisonment for two years with the provision that he can purge himself of the contempt if he answers the questions propounded to him within 60 days. This is a strange kind of sentence, apparently combining in one judgment the elements of both civil and criminal contempt. This fact alone is sufficient to arouse grave doubts in my mind as to the validity of the judgment, since civil and criminal contempt procedures are quite different and call for the exercise of quite different judicial powers. Moreover, analysis of this judgment makes it clear that it rests upon the notion that petitioner has as yet committed no crime and is being sentenced for civil contempt for the sole purpose of coercing his compliance with the demand for his testimony, but that if he fails to comply with this demand within the specified period, he *will have* committed a criminal contempt. Thus the judgment seems to represent a present adjudication of guilt for a crime to be committed in the future. The fact that the judgment has not been challenged on this specific ground by petitioner does not, in my view, bar our consideration of it. Ordinarily, a judgment invalid on its face can be challenged at any time. I find it unnecessary, however, to reach a definite conclusion on this question

because, even assuming that the judgment is not invalid as a result of its hybrid nature, I still think it should be reversed.

Petitioner contends that the decision of the Court of Appeals should be reversed because the two-year sentence is excessive. That contention is sufficient to bring into issue any ground upon which the length of the sentence may open the decision to attack. Cf. *Boynton* v. *Virginia*, 364 U. S. 454, 457. I think the imposition of a two-year sentence was beyond the District Court's power in the summary proceedings it conducted in this case. In my dissenting opinion in *Green* v. *United States*, 356 U. S. 165, 193, I stated in full the reasons which led me to conclude that where the object of a proceeding is to impose punishment rather than merely to coerce compliance, "there is no justification in history, in necessity, or most important in the Constitution for trying those charged with violating a court's decree in a manner wholly different from those accused of disobeying any other mandate of the state." *Id.*, at 218. I adhere to that view and reiterate my belief that the Court's position rests solely upon the fact that "judges and lawyers have told each other the contrary so often that they have come to accept it as the gospel truth." *Id.*, at 219. Thus, I cannot join a decision upholding a two-year sentence for contempt upon a trial in which the accused has been denied the constitutional protections of indictment by a grand jury and determination of guilt by a petit jury. I regard this case as another ominous step in the incredible transformation and growth of the contempt power and in the consequent erosion of constitutional safeguards to the protection of liberty. I see no reason why petitioner should not have been tried in accordance with the law of the land—including the Bill of Rights—and conclude, therefore, that the case should be reversed for such a trial.