UNITED STATES of America,
Appellee,

v.

Wincel HENDRIX, Appellant.

No. 1231, Docket 74–1603.

United States Court of Appeals,
Second Circuit.

Argued Aug. 14, 1974.

Decided Oct. 15, 1974.

Gavin W. Scotti, Asst. U.S. Atty., E. D.N.Y. (David G. Trager, U.S. Atty., Raymond J. Dearie, Asst. U. S. Atty., E.D.N.Y., Brooklyn, N. Y., of counsel), for appellee.

Michael A. Young, William J. Gallagher, The Legal Aid Society, New York City, for appellant.

Before OAKES, Circuit Judge, and FRANKEL and KELLEHER, District Judges.*

FRANKEL, District Judge:

Convicted upon seemingly powerful evidence, and sentenced to concurrent terms of which the longer is for 10 years' imprisonment, the defendant complains that the trial judge committed reversible error by adding two years to what the sentence might otherwise have been because he was convinced beyond a reasonable doubt that the defendant had perjured himself. A lesser question is whether there was prejudicial impropriety in Judge Mishler's intervention to press for corroboration of testimony by defendant's wife on his behalf after she had volunteered that such corroboration was available. Rejecting both grounds of appeal, we affirm the conviction.

I.

On the evening of June 22, 1973, the appellant was arrested under a warrant charging unlawful heroin dealings for which he was thereafter convicted in the Southern District of New York and sentenced to a three-year term he is now serving.[1] At the time of the arrest he

---

* Of the Southern District of New York and the Central District of California, respectively, sitting by designation.

1. The sentence questioned on the present appeal was ordered to run concurrently with the Southern District's. The latter conviction was affirmed without opinion. United States v. Hendrix, 502 F.2d 1162 (2d Cir., 1974).

was carrying a paper bag that contained a number of packages of mannite, a substance commonly used to dilute narcotics. Later in the night, at the law enforcement office to which he was taken, an inventory search produced from appellant's pocket 2.4 grams of cocaine wrapped in tin foil and six marihuana cigarettes. A far more damning haul, however, was taken elsewhere.

While appellant was being arrested, narcotic officers were executing a search warrant for his house in Elmhurst, Queens. Appellant was taken to the house and detained there while the search proceeded. The officers found in the master bedroom more than a pound of cocaine in a shopping bag which also contained two pounds of mannite and two measuring spoons. Another brown shopping bag held two pounds of marihuana and a quantity of hashish. Among the other things in the master bedroom were a scale and measuring pan on a bedside table; a suitcase near the bed holding more mannite, a bottle of lactose, two strainers, a measuring spoon, and two rolls of aluminum foil; a metal box containing currency and coins amounting to over $3,000, a holster, and a supply of .38 caliber cartridges; and a jewelry box on a dressing table in which was a tin foil package of about four grams of cocaine. Elsewhere in the house were found a small amount of marihuana and eleven marihuana cigarettes.

Before the search had ended an officer in charge began to order removal of some mirrors in a basement bar to see if they concealed contraband. The appellant protested, with apparent success, that this action, costly to repair, was unnecessary because the agents already had everything.

Testifying in his own defense, appellant said he had "tried" cocaine and marihuana, but that he knew nothing of the quantities of these substances or of the other paraphernalia found in his bedroom. He said the mannite he'd been carrying was for a friend named John. He was employed, he said, as a garage man and parking attendant earning, according to his tax returns, some $6,000 to $7,000 a year. He also told that he had since 1966 been buying a new Cadillac automobile every two years and that for his house, priced at $64,000, he made a $36,000 down payment in November 1972, $10,000 in a certified check and $26,000 in currency.

Supporting the latter point, appellant's wife testified that $10,000 of the down payment had come from relatives and $12,000 from "hitting" a number.[2] As for the $3,000 in currency and coins found in the bedroom, Mrs. Hendrix explained that she and her brother owned a boutique in Atlanta for which he sent her money periodically to purchase clothing. On cross-examination she could not remember any stores where she had made such purchases, but volunteered that her brother, to whom she sent the bills, would be able to help her with this information. The district judge's suggestion that she use a recess to call her brother gives rise to the second, and less consequential, of the arguments on appeal.

## II.

■ Following the highly desirable course of making explicit a factor he deemed material for the sentence, United States v. Velazquez, 482 F.2d 139, 142 (2d Cir. 1973); United States v. Brown, 479 F.2d 1170, 1172–1173 (2d Cir. 1973), Judge Mishler said he was "convinced beyond a reasonable doubt" that appellant had perjured himself (as did his wife) on the witness stand. More pointedly, he said this was "the most outrageous situation of perjury in any trial" he had seen in some 13 years on

---

2. Mrs. Hendrix said, on both direct and cross, that she had "hit the number" in 1973. When the date of the down payment was called to her attention, she said her hit might have been in 1972 after all.

the bench. Noting that the stories told under oath had been "bizarre to say the least," the judge went on to say:

". . . I think defendants should be encouraged to take the witness stand but when they take the witness stand I think they must understand that there is a certain risk they take, they better tell the truth.

"I feel I added about two years for perjury during the trial in my sentence."

In this, appellant says, the trial judge erred, so that there must be a resentencing. We reach the point on the merits despite the normal unreviewability of federal sentences. Gore v. United States, 357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); cf. A.B.A. Minimum Standards for Criminal Justice, Appellate Review of Sentences (Approved Draft 1968). For the contention is, of course, that the consideration of perjury was impermissible, carrying the judge outside the wide range of discretion in sentencing. Cf. United States v. Tucker, 404 U.S. 443, 447, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); Townsend v. Burke, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948); McGee v. United States, 462 F.2d 243, 245–246 (2d Cir. 1972); United States v. Malcolm, 432 F.2d 809, 815–816 (2d Cir. 1970). Having reached the contention, we reject it.

The appellant urges in substance that to punish him by an enhanced sentence for perjury amounts to a kind of conviction for another crime without the safeguards of indictment and trial. But this ignores the nature of the sentencing process as it exists in our system and of the factors the trial judge may consider in exercising a frequently enormous range of discretion. If there is no clear consensus on these factors, it is certainly clear that they include, as aggravating circumstances, conduct that is not literally "criminal," or at least has not been duly adjudged criminal in the case in which sentence is being imposed. Prior convictions may cause a heavier sentence, though the defendant has already "paid" for them. A general course of dissolute, irresponsible, shiftless, or dangerous behavior may be deemed to call for longer incarceration though none of its components are, strictly, "crimes." "The aim of the sentencing court is to acquire a thorough acquaintance with the character and history of the man before it." United States v. Doyle, 348 F.2d 715, 721 (2d Cir.), cert. denied, 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965). And so, in the cited case and elsewhere, United States v. Cifarelli, 401 F.2d 512, 514 (2d Cir.), cert. denied, 393 U.S. 987, 89 S.Ct. 465, 21 L.Ed.2d 448 (1968), this court has held that crimes on which there has been no conviction may be considered as calling for increased punishment. The same is true even for evidence of counts on which a defendant is acquitted. United States v. Sweig, 454 F.2d 181, 184 (2d Cir. 1972). Materials like these are surely not less reliable in any pertinent sense than the standard kinds of information presentence reports contain. Even assuming that controverted assertions in such reports may be aired in a hearing, or that hearsay may be taken at a discount, cf. Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); United States v. Doyle, *supra*, 348 F.2d at 721, the judge's use and appraisal of a vivid trial circumstance, after adversary testing, is scarcely to be deemed less reliable. See United States v. Sweig, *supra*, 454 F.2d at 184.

The appellant invokes as his main support the case of Scott v. United States, 135 U.S.App.D.C. 377, 419 F.2d 264 (1969). Announcing the court's decision there, Chief Judge Bazelon first discussed the trial judge's apparent lengthening of the sentence because the defendant failed to make a "clean breast" and show remorse after trial. Holding that the "pressure placed upon him to confess his guilt after trial" (p. 267) entitled defendant to be resentenced in any event, the Chief Judge went on to treat "two other considerations" (p. 268), including the sentencing

judge's evident reliance upon his belief that the defendant had committed perjury during the trial. This aspect of the decision, given the other grounds treated at length in the first opinion as well as the separate opinions of the two other panel members, supplies at best an uncertain measure of support for the present appellant. To the extent the D. C. Circuit leans that way, we are led respectfully to differ.

The five other Circuits addressing the question, according to counsel's and our own researches, have likewise disagreed, both before and since, with this aspect of Scott v. United States, *supra*. The Tenth Circuit, in Humes v. United States, 186 F.2d 875, 878 (1951), held it "entirely proper . . . to consider the character" of the defendant as reflected in his own, and his inducement of another's, perjury at the trial. The Seventh Circuit likewise marked such a circumstance "as a reflection of the character of the person before the court for sentencing." United States v. Levine, 372 F.2d 70, 74 (1963). The Sixth Circuit has said that an "inescapable" demonstration of defendant's perjury is a fact the sentencing judge might well be derelict in ignoring. United States v. Wallace, 418 F.2d 876, 878 (1969), cert. denied, 397 U.S. 955, 90 S.Ct. 987, 25 L. Ed.2d 140 (1970). Completing the roster, see United States v. Moore, 484 F.2d 1284, 1287 (4th Cir. 1973) (but see also Craven, J., dissenting), and United States v. Cluchette, 465 F.2d 749, 754 (9th Cir. 1972).

The effort to appraise "character" is, to be sure, a parlous one, and not necessarily an enterprise for which judges are notably equipped by prior training. Yet it is in our existing scheme of sentencing one clue to the rational exercise of discretion. If the notion of "repentance" is out of fashion today, the fact remains that a manipulative defiance of the law is not a cheerful datum for the prognosis a sentencing judge undertakes. Compare Bazelon, C. J., with Leventhal, J., in Scott v. United States, *supra,* 419 F.2d at 269 and 282, respectively. Impressions about the individual being sentenced—the likelihood that he will transgress no more, the hope that he may respond to rehabilitative efforts to assist with a lawful future career, the degree to which he does or does not deem himself at war with his society— are, for better or worse, central factors to be appraised under our theory of "individualized" sentencing. The theory has its critics. While it lasts, however, a fact like the defendant's readiness to lie under oath before the judge who will sentence him would seem to be among the more precise and concrete of the available indicia.

The appellant protests that this position threatens a "chilling effect" for the defendant considering whether to take the stand. Without denying that the point has substance, we may say that it is not wholly evil to discourage defendants from taking the stand to lie. On the other side of the scale, most sentencing judges would probably acknowledge a disposition to encourage "cooperation"—truth-telling to aid law enforcement—by considering it a factor in defendant's favor.

■ The danger remains that defendants may be caused unduly to refrain from testifying because of fear that the jury's or the judge's disbelief will automatically lead to an increased sentence. There are better modes of dealing with the problem, however, than a flat and unrealistic rule that perjury at the trial must never be considered. First, as a matter of unscientific observation and introspection, we suggest that trial judges generally are (or become) sophisticated and experienced enough to know that the convicted defendant who took the stand is not *ipso facto* a perjurer. Second, to encourage a measured approach to the subject, we hold today that in the future perjury should not be treated as an adverse sentencing factor unless the judge is persuaded beyond a reasonable doubt that the defendant committed it. Short of that, we share the Fourth Circuit's view that the evidence of false trial testimony should be

bypassed for sentencing purposes and left to the United States Attorney for possible prosecution. United States v. Moore, *supra*, 484 F.2d at 1288.

In the present case, as has been noted, even retrospective application of the rule now announced would lead to affirmance. Defense counsel at the sentencing acknowledged the inescapable fact that "the jury chose not to believe Mr. Hendrix's version of the facts. . . ." This was a case where the jury could not have convicted without being persuaded beyond a reasonable doubt that the appellant had lied, deliberately and wilfully. The trial judge concurred in that unanimous persuasion.

### III.

■ The remaining question is a shorter subject. Mrs. Hendrix, in the episode generating this issue, had explained the bedroom cache of over $3,000 in paper money and coins as having been sent by her brother to purchase things for an Atlanta store she claimed to own jointly with him. When she could not remember the stores at which she had ever made such purchases, the following ensued:

"Q. You don't remember the name of any of these stores?

"A. No, but I can get them.

"Q. How can you get them?

"A. I have to call my brother.

"Q. Your brother has them?

"A. I send the bills to him.

"The Court: Would you like a short adjournment so you can call your brother. You may step down. We'll take a ten minute recess.

"The Witness: The store is not open today and I'll call—

"The Court: Step down and do the best you can. We'll take a ten minute recess.

"(Whereupon jurors were excused from the courtroom.)"

In the jury's absence there was colloquy that reflected the trial judge's apparent skepticism concerning Mrs. Hendrix's devotion to the truth. While appellant quotes these lines at length, they do not help him.

We need not explore fully for this case the extent to which "[a] trial judge conducting a case before a jury in the United States courts is more than a mere 'moderator,'" United States v. Brandt, 196 F.2d 653, 655 (2d Cir. 1952). The dangers of straying too far or too often from the moderator's role have been signaled often enough in the decisions of this court. E.g., United States v. Fernandez, 480 F.2d 726, 735–738 (2d Cir. 1973); United States v. Nazzaro, 472 F.2d 302, 307–313 (2d Cir. 1973); United States v. Guglielmini, 384 F.2d 602, 605 (2d Cir. 1967). We are satisfied that the judge's intervention in this case, prompted by a gratuitous but presumably verifiable "explanation" from the witness, was wholly in bounds. The effort to find material error in this episode attests to the commendable zeal of counsel, but cannot serve to nullify appellant's conviction.

Affirmed.