**Walter MARTIN, Jr., Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 74–1235.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 6, 1975.

Decided May 2, 1975.

Certiorari Denied Oct. 6, 1975. See 96 S.Ct. 105.

United States v. Liebert, No. 74–2294 (3rd Cir., argued April 18, 1975).

Kenneth J. Bini, St. Louis, Mo., for appellant.

Richard E. Coughlin, Asst. U. S. Atty., St. Louis, Mo., for appellee.

Before GIBSON, Chief Judge, and HEANEY and ROSS, Circuit Judges.

GIBSON, Chief Judge.

This appeal presents the question of whether a federal district judge has the power to impose a civil contempt sentence upon a witness serving a prior criminal sentence and thus suspend the service of that criminal sentence during the contempt confinement. Petitioner, Walter Martin, Jr., was convicted January 3, 1973, of two counts of distribution of heroin and received concurrent sentences of 10 years imprisonment to be followed by a three-year special parole term.[1] Upon appeal his conviction was affirmed. United States v. Martin, 482 F.2d 202 (8th Cir. 1973).

On February 20, 1973, after Martin had begun service of his sentence and during the pendency of his appeal, he was called before a grand jury in the Eastern District of Missouri. After being granted immunity, he was questioned regarding the source of the heroin he had distributed. Upon his refusal to testify, repeated before the District Court,[2] Judge Meredith adjudged Martin in contempt, pursuant to 28 U.S.C. § 1826(a),[3] and ordered him confined for the duration of the grand jury proceedings or until he testified, but in no event for more than 18 months. In addition, the court ordered that the contempt sentence was not to be credited towards service of petitioner's criminal sentence. Martin was in custody pursuant to the contempt citation until September 26, 1973, when the grand jury session ended and as a result of the contempt confinement the termination date of his criminal sentence was extended some seven months.

The present proceeding was instituted by a 28 U.S.C. § 2255 (1970) motion to vacate the civil contempt sentence as an

1. Sentence was imposed by the Honorable John K. Regan, United States District Judge for the Eastern District of Missouri.

2. The Honorable James H. Meredith, Chief Judge, United States District Court for the Eastern District of Missouri.

3. 28 U.S.C. § 1826(a) (1970) was enacted as section 301(a) of Title III of the Organized Crime Control Act of 1970, Pub.L. No. 91–452 (Oct. 15, 1970). The section provides:

§ 1826. *Recalcitrant witnesses.*

(a) Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information * * * the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of—

(1) the court proceeding, or

(2) the term of the grand jury, including extensions, before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

unauthorized interruption of the original criminal sentence. The motion was denied by the District Court on March 5, 1974, and this appeal taken. Martin's basic contention is that the District Court had no power to stay the running of the prior criminal sentence during the period of Martin's confinement for civil contempt.[4] Two circuits have considered this same basic contention and rejected it. United States v. Liddy, 166 U.S.App. D.C. 289, 510 F.2d 669 (1974) (en banc), cert. denied, 420 U.S. 980, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975); Anglin v. Johnston, 504 F.2d 1165 (7th Cir. 1974), cert. denied, 420 U.S. 962, 95 S.Ct. 1353, 43 L.Ed.2d 440 (1975). We reject it as well.

■ We would first note that after conviction for an offense, a grant of immunity to compel a prisoner to testify concerning that same offense can present disturbing questions, especially when, as here, there is a suggestion that the refusal to testify is motivated at least in part by a fear for personal safety. However, whatever our personal feelings about the course adopted by the Government in this case, compelling testimony in identical circumstances was approved by the Supreme Court in Piemonte v. United States, 367 U.S. 556, 81 S.Ct. 1720, 6 L.Ed.2d 1028 (1961). While the result seems harsh and may smack of "unjustifiable harassment," see Piemonte v. United States, supra at 564, 81 S.Ct. 1720 (Warren, C. J., dissenting), we are bound by the Piemonte decision and thus cannot say that Martin could not be compelled to testify in these circumstances.

Once it is established that petitioner's testimony could be compelled under the grant of immunity,[5] the question is what the power of the court was when confronted by Martin's refusal to testify.

The dissent would limit the court to criminal contempt proceedings. However, we can find no such limitation upon the court's power.

There is no indication that the civil contempt sanction provided by 28 U.S.C. § 1826(a) was not to be available to punish already incarcerated contemnors.[6] United States v. Liddy, supra, at 675 n. 24. Nor do we understand Martin's argument to be that the court may not find him in civil contempt under 28 U.S.C. § 1826(a). Rather, his claim is that the court has no power to interrupt the running of his present criminal sentence in order to give coercive effect to the civil contempt confinement. If Martin's argument is correct, any such confinement would be tantamount to a concurrent sentence and as a practical matter would remove the coercive effect of the contempt confinement.

■ We think it unlikely that Congress, had it considered the problem, would have intended to immunize incarcerated witnesses from the coercive sanctions of § 1826(a) when all other classes of witness are subject thereto. See Kastigar v. United States, 406 U.S. 441, 446–47, 92 S.Ct. 1653, 1657, 32 L.Ed.2d 212 (1972):

The existence of these statutes reflects the importance of testimony, and the fact that many offenses are of such a character that the only persons capable of giving useful testimony are those implicated in the crime. Indeed, their origins were in the context of such offenses, and their primary use has been to investigate such offenses.

No sound policy reason exists to support a conclusion that prisoners can escape the application of § 1826(a) when a person charged but not convicted of an of-

---

4. He also contends that the imposition of the civil sentence vacated the prior criminal sentence because of the "illegal admixture."

5. Indeed, the grant of immunity may not have been necessary. See Reina v. United States, 364 U.S. 507, 513, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960).

6. See H.R.Rep.No.1549, 91st Cong., 2d Sess. (1970), reprinted in U.S.Code Cong. & Admin. News 4007, 4022 (1970):

Section 1826(a) becomes applicable to any proceeding before or ancillary to any court or grand jury in which a witness unjustifiably refuses to testify or produce other information.

fense, or one convicted but not yet sentenced would be subject to its application.

However, Martin argues that such a result is compelled by 18 U.S.C. § 3568 (1970) which prescribes the method of computation of criminal sentences. That section provides:

> The sentence of imprisonment of any person convicted of an offense shall commence to run from the date on which such person is received at the penitentiary, reformatory, or jail for service of such sentence. The Attorney General shall give any such person credit toward service of his sentence for any days spent in custody in connection with the offense or acts for which sentence was imposed. As used in this section, the term "offense" means any criminal offense * * * which is in violation of an Act of Congress and is triable in any court established by Act of Congress.

> \* \* \* \* \* \*

> No sentence shall prescribe any other method of computing the term.

Martin argues that the last quoted sentence of § 3568 provides that once the service of a sentence is commenced, it cannot be interrupted by an intervening civil contempt confinement, noting the very limited power that a trial court has to modify the terms of a sentence once imposed. But it is not entirely correct to speak of the action of the District Court in this case as a modification of the prior criminal sentence. First and foremost it was the imposition of a civil sanction for a refusal to testify. To be sure, Judge Meredith ordered that the civil custody should not be credited towards service of the criminal sentence, but we are convinced that this result would have obtained absent the court's order. *See* Anglin v. Johnston, *supra* at 1169 & n. 4.

Confinement pursuant to § 1826(a) is a civil sanction and not punishment for a criminal offense. *See* United States v. Liddy, *supra,* at 675; Anglin v. Johnston, *supra* at 1167.[7] As succinctly stated by the court in *Anglin*:

> The language of section 3568 is unambiguous. Credit shall be given for time spent "in connection with the offense or acts for which sentence was imposed" and "offense" is defined as a "criminal offense." The confinement for which petitioner seeks credit was imposed in connection with a civil contempt (refusal to testify) and not in connection with the criminal offense "for which sentence was imposed."

Anglin v. Johnston, *supra* at 1167.

Thus, the question is not whether the District Court had the power to interrupt the presently running criminal sentence, but whether the civil contempt sentence validly imposed by the court for violation of § 1826(a) operates to interrupt the prior criminal sentence. We hold that it does. Of course, the court could specifically provide for concurrency, although it is unlikely that it would wish to eliminate the coercive effect of the confinement. We think that interruption of the criminal sentence by a civil confinement pursuant to § 1826(a) is not in derogation of 18 U.S.C. § 3568 but arises from the clear and unambiguous provisions of that statute.

Our analysis is not conditioned upon what might be termed the "fault of the prisoner." *See* United States v. Liddy, *supra.* Although there are instances in which the "fault" of a prisoner serves to interrupt the running of a criminal sentence and thus postpones its termination date, *see* United States v. Liddy, *supra* at 674–75; Anglin v. Johnston, *supra* at 1168–69, determination of the effect of a civil contempt sentence is not dependent upon a finding of fault of the prisoner.

7. *See also* H.R.Rep.No.1549, 91st Cong., 2d Sess. (1970), *reprinted in* U.S.Code Cong. & Admin.News 4007, 4022 (1970):

> The confinement is civil, not criminal; its purpose is to secure the testimony through a sanction, not to punish the witness by imprisonment.

Such a determination rests upon the interpretation of § 1826(a) and § 3568.

■ We further question the applicability in this case of the general proposition that a district court lacks the power to change the term of a sentence once imposed or that its jurisdiction to do so is lost while the case is on appeal. *See* United States v. Liddy, 166 U.S.App.D.C. 289, 510 F.2d 669 (1974) (MacKinnon, J., dissenting). The civil contempt proceeding here was an entirely separate court proceeding from the criminal case (indeed, different judges imposed the sentences at issue, although that factor would not change the result). If the court had the power to find Martin in contempt during the pendency of his criminal appeal, as it surely did, it had the power to impose a sanction based upon that finding unaffected by the pending appeal in the criminal case.

The judgment of the District Court denying relief is affirmed.

HEANEY, Circuit Judge (dissenting).

I respectfully dissent. In my view, 18 U.S.C. § 3568 prohibits that portion of the District Court's civil contempt judgment which ordered interruption of the criminal sentence. Nothing in the majority opinion establishes that any Supreme Court decision compels the result reached in United States v. Liddy, 166 U.S.App.D.C. 289, 510 F.2d 669 (1974) (en banc), cert. denied, 420 U.S. 980, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975), and Anglin v. Johnston, 504 F.2d 1165 (7th Cir. 1974), cert. denied, 420 U.S. 962, 95

S.Ct. 1353, 43 L.Ed.2d 440 (1975).[1] Those two decisions approve a new prosecutorial weapon which is tailor made to serve as an instrument of governmental oppression, and our Court's decision to join in that approval is regrettable.

At the outset, I recognize the law's right to "everyman's evidence." United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039, 1064 (1974). It is essential that the Grand Jury have power to compel the appearance and testimony of witnesses. Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). When a witness interposes the constitutional defense against self-incrimination, the government can disarm him of that defense by according immunity. Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). For the recalcitrant witness, who maintains his silence even in the wake of court-ordered immunity, the contempt sanction has long been recognized as necessary.

Martin does not deny the validity of these established principles. Nor does he assert that a prior conviction creates the right to refuse to answer questions relating to the underlying crime.[2] His sole contention is that, in selecting the coercive tool to enforce its mandate, the court was without power to interrupt the running of his criminal sentence. Acceptance of that contention does not mean, as the government asserts, that Martin will enjoy "virtual immunity from the consequences of his contumacious behavior."

1. The majority opinion boils down to the conclusion that, because the Supreme Court has sanctioned the use of *criminal* contempt against a prisoner, *see* note 2, *infra*, we are bound to hold that *civil* contempt may be imposed by interrupting the running of a criminal sentence. This conclusion is a *non sequitur* which ignores the fact that the former remedy requires no interruption of an existing sentence and further ignores the procedural distinctions between criminal and civil contempt. *See* p. 913, *infra*.

2. The Supreme Court has held that conviction for a criminal act does not preclude use of the

*criminal* contempt sanction when the convict refuses to testify before a Grand Jury probing into the circumstances underlying the offense. Reina v. United States, 364 U.S. 507, 512–513, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960); Piemonte v. United States, 367 U.S. 556, 81 S.Ct. 1720, 6 L.Ed.2d 1028 (1961). *Cf.* Katz v. United States, 389 U.S. 347, 349 n.3, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); United States v. Kelly, 464 F.2d 709, 713 (5th Cir. 1972); United States v. Castaldi, 338 F.2d 883, 884 (2nd Cir. 1964), vacated, 384 U.S. 886, 86 S.Ct. 1906, 16 L.Ed.2d 993 (1966). *But see* Piemonte v. United States, *supra* at 564, 81 S.Ct. 1720. (Warren, C.J., dissenting). *See also* note 13 *infra*.

## I. THE COMMON LAW POWER TO INTERRUPT A CRIMINAL SENTENCE

It is doubtful that, at common law, a court had power to interrupt service of a criminal sentence in this manner. Even when the rule was that judgments were within the control of the court during the term at which they were made and could be altered during that term, an exception to the rule was that punishment could not be "augmented" once the prisoner had been committed. *See* United States v. Benz, 282 U.S. 304, 307, 51 S.Ct. 113, 75 L.Ed. 354 (1931). Whether or not it amounted to "augmentation," governmental action which subjected the prisoner to service of his sentence in installments was condemned in its own right. *See* White v. Pearlman, 42 F.2d 788, 789 (10th Cir. 1930). With the adoption of the Federal Rules of Criminal Procedure, the limited common law power to modify a sentence was further curtailed. We held in Egan v. United States, 268 F.2d 820, 823 (8th Cir.), cert. denied, 361 U.S. 868, 80 S.Ct. 130, 4 L.Ed.2d 108 (1959), that, except as provided by Rule 35, "the beginning of the service of the sentence in a criminal case ends the power of the court to change it." And as recently as last year, we declared that "the district court is without power to issue an order affecting its judgment absent an express statutory grant of authority." United States v. Regan, 503 F.2d 234, 238 (8th Cir. 1974). Since the government does not claim that the interruption of the sentence here ordered is expressly authorized by either Rule 35 or any statute, the District Court's power—if there be any—must be found in some residue of the common law, notwithstanding our indication in *Regan* that there is no such residue.

There was at common law the power to interrupt the running of a criminal sentence in a few specific instances. *See* Theriault v. Peek, 406 F.2d 117 (5th Cir. 1968) (per curiam), cert. denied, 394 U.S. 1021, 89 S.Ct. 1644, 23 L.Ed.2d 47 (1969) ("escape from prison interrupts service");

McDonald v. Lee, 217 F.2d 619, 623 (5th Cir. 1954), vacated as moot, 349 U.S. 948, 75 S.Ct. 893, 99 L.Ed. 1274 (1955) (second sentence, for violation of conditions of military confinement, interrupts running of first sentence); Anderson v. Corall, 263 U.S. 193, 44 S.Ct. 43, 68 L.Ed. 247 (1923) (time between grant of parole and its revocation not credited toward underlying sentence). This common law power undoubtedly persists, despite a lack of the express statutory grant of authority which would seem to be required by United States v. Regan, *supra*. But the power is a narrow one, carved out in full recognition of the fact that a prisoner has a right—albeit a conditional one—to serve a continuous sentence:

> A prisoner has some rights. A sentence of five years means a continuous sentence, unless interrupted by escape, violation of parole, or some fault of the prisoner, and he cannot be required to serve it in installments. Certainly a prisoner should have his chance to re-establish himself and live down his past. Yet, under the strict rule contended for by the warden, a prisoner sentenced to five years might be released in a year; picked up a year later to serve three months, and so on ad libitum, with the result that he is left without even a hope of beating his way back. * * *

White v. Pearlman, *supra* at 789. *See also* Albori v. United States, 67 F.2d 4, 7 (9th Cir. 1933); McDonald v. Lee, *supra* at 623.

The government urges that Martin's silence before the Grand Jury is the type of conduct which merits application of the "fault of the prisoner" exception. I cannot agree that this common law residual power can be construed that broadly. In two of the three cases cited as examples of its exercise, the convict was clearly not "in custody" during the court-declared hiatus. Anderson v. Corall, *supra*; Theriault v. Peek, *supra*. Those cases simply stand for the sensible proposition, codified in § 3568, that no credit shall be given for time not spent "in custody;" the reference to "fault" on

the part of the convict was dictum. This leaves only McDonald v. Lee, *supra*, as a case which was truly founded on the "fault" of a prisoner. That case, however, involved military confinement pursuant to court martial and specifically dealt with the effect of a second court martial sentence on an earlier sentence. The court there relied heavily on military law, and the relevance of its decision to civilian law is dubious.[3]

The majority admits that it does not rely on the "fault of the prisoner" doctrine, *see* p. 909, *supra*, thereby shunning the precedents relied on in United States v. Liddy, *supra* at 674–675, and Anglin v. Johnston, *supra* at 1167–1168. However, having rejected the reasoning of those decisions, the majority persists in embracing their result. Our Court is thus the first to sanction this type of tampering with a criminal sentence without justifying the District Court's power under common law precedent. Instead, the majority concludes that the District Court's power "arises from the clear and unambiguous provisions" of § 3568. *Supra* at p. 909. On the contrary, I read that statute to unambiguously provide that the District Court has no such power.

## II. THE EFFECT OF § 3568

Section 3568 is consistent with and perpetuates the common law rule that the District Court lacks power to interrupt the running of a prisoner's criminal sentence under these circumstances. The statute does three significant things: (1) it provides rigid rules for fixing the commencement date of the sentence; (2) it specifies which days the Attorney General shall credit toward service of the sentence; and (3) it provides that "[n]o sentence shall prescribe any other method of computing the term."

The government would have us ignore the second aspect of the statute, and read the third narrowly in light of the first. It argues that § 3568 is concerned only with the method of calculating the *commencement* of the sentence. *See* United States v. Liddy, *supra* at 674. I cannot agree that the statute is concerned only with the commencement date[4] for, by its very terms, it deals with the days to be credited toward service of sentence. The government's argument would require us to rewrite the final sentence of § 3568 to read: "No sentence shall prescribe any other method of computing *the commencement of* the term." That, of course, is not what it says.

Nor does the legislative history convince me that § 3568 means other than what it says. The government stresses that the Justice Department had complained to Congress of uncertainty surrounding the commencement date, and had decried "juggling with sentences" which was taking place due to this uncertainty. *See* S.Rep.No.803, 72d Cong., 1st Sess. 2 (1932); United States v. Liddy, *supra* at 674. But to hinge our construction of the statute solely on the fact that a specific problem had given rise to its enactment would be a precarious and stultifying course, proceeding on the unstated assumption that, if a problem has not yet occurred and been brought to the legislature's attention, it cannot be governed by statute. Judge MacKinnon's interpretation of § 3568 is more persuasive:

> \* \* \* [T]he majority finds that this statute, which prohibits any unnecessary hiatus between sentencing and the start of service, is irrelevant to the issue of judicial power to effect an even more disruptive delay once service of sentence has already commenced. If juggling of sentences is to be prohibited before commitment occurs, it is even more offensive once a term of imprisonment has begun. \* \* \*

United States v. Liddy, *supra* at 681–682 (MacKinnon, J., dissenting).

---

**3.** Section 3568 is expressly not applicable to courts martial.

**4.** Nor do I understand the majority opinion to have accepted this argument.

Nothing in the legislative history, or in the opinion in Anglin v. Johnston[5], *supra* or United States v. Liddy, *supra,* convinces me that the statute exempts the kind of tampering with a criminal sentence which was undertaken by the District Court here.

## III. THE INTERESTS OF THE GOVERNMENT AND THE INTERESTS OF THE PRISONER

The government, however, urges that denial of the power to interrupt a criminal sentence will give prisoners "virtual immunity from the consequences of [their] contumaceous behavior" in refusing to testify. The District of Columbia Circuit accepted that argument, grounding its ruling on a finding of necessity. It concluded that the court's use of the civil contempt sanction must remain unencumbered because the alternative modes to coerce testimony are "defect[ive]." [6] *Id.* at 676. Although it did not list the procedural safeguards surrounding the use of criminal contempt as "defects," the court expressed its awareness of those safeguards. *Id.* at 675 n. 27.

The government has greatly overstated the comparative effectiveness of the civil contempt sanction in the prisoner context, and no showing has been made that the power to interrupt criminal sentences is mandated by necessity. Moreover, there are strong policy reasons warranting the extension of procedural protections to the prisoner who is ordered to testify concerning the details of the offense underlying conviction. Such procedural protections would be an automatic result of a holding that the District Court lacks power to interrupt a criminal sentence for a criminal contempt sentence of more than six months may not be imposed without giving the prisoner a right to trial by jury,[7] and no criminal contempt sentence may be imposed without according the safeguards of an ordinary criminal proceeding.[8]

## A. THE POWER TO INTERRUPT A CRIMINAL SENTENCE IN ORDER TO GIVE COERCIVE EFFECT TO A CIVIL CONTEMPT SANCTION IS NOT MANDATED BY NECESSITY

Historically, when the government has sought to compel a prisoner to testify

---

5. The Seventh Circuit held that the statute requires that credit be given only for days spent in custody for the criminal charge and that, in light of the District Court's common law power to interrupt the running of a criminal sentence, the intervening days were not spent in custody on that charge. Anglin v. Johnson, 504 F.2d 1165, 1167 (7th Cir. 1974), cert. denied, 420 U.S. 962, 95 S.Ct. 1353, 43 L.Ed.2d 440 (1975). In other words, the Seventh Circuit found that § 3568 was not a barrier to the execution of the District Court's common law power.

The majority attempts to extract only a portion of this logic, quoting the Seventh Circuit with approval while at the same time eschewing the common law precedential underpinnings which were vital to that court's reasoning. *Supra* at p. 909. Stripped of its common law underpinnings, the majority's adoption of the Seventh Circuit approach assumes what is at issue, since it assumes that the District Court had power to wrest the prisoner from custody on the first charge and order that the first sentence be served in installments. If the court had no such common law power, as I would hold and as the majority seems to acknowledge, Martin's incarceration was all "in connection with" the criminal offense. Section 3568, standing alone, cannot provide the answer which the majority finds therein.

6. The Court stated: "[T]here are limitations on the criminal contempt device that make us reluctant to insist that the District Court employ it here." United States v. Liddy, 510 F.2d 669, 675 (D.C.Cir. 1974) (en banc), cert. denied, 420 U.S. 980, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975). It gave two limitations: (1) criminal contempt should be resorted to only when civil contempt is inappropriate; and (2) since criminal contempt involves a fixed term which must be served, the prisoner cannot purge himself, and the coercive element is lost. The first objection assumes that civil contempt is appropriate, which is, of course, the very issue being litigated. If civil contempt is not appropriate, then obviously the criminal sanction is permitted. *See* United States v. Di Mauro, 441 F.2d 428, 435 (8th Cir. 1971). As to the second objection, see p. 914, *infra.*

7. Cheff v. Schnackenberg, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966).

8. United States v. Di Mauro, *supra* at 433. *See also* Federal Rule of Criminal Procedure 42(b).

about the events underlying his conviction, the sanction which has been used to break down his recalcitrance has been a fixed criminal contempt sentence to be served at the expiration of the currently running criminal sentence. *See* Piemonte v. United States, 367 U.S. 556, 81 S.Ct. 1720, 6 L.Ed.2d 1028 (1961); Reina v. United States, 364 U.S. 507, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960). *Cf.* United States v. Castaldi, 338 F.2d 883 (2nd Cir. 1964), vacated, 384 U.S. 886, 86 S.Ct. 1906, 16 L.Ed.2d 993 (1966).[9] In sentencing Martin to civil contempt, the District Court noted that it had power to invoke the criminal alternative. Neither party has brought to our attention any instance prior to Martin's case in which a federal prisoner has had a civil contempt sanction invoked against him with the proviso that his criminal sentence was to be interrupted.[10] In light of the infant status of this technique, any claim that it is absolutely necessary to effectuate the court's order must be viewed with skepticism.

The government's claim of necessity must rest on the assumption that Martin, who was already serving a ten-year sentence, would be *substantially* more coerced by the eighteen-month maximum civil sentence imposed here than he would be by a similar fixed criminal term added to the end of his current sentence. I am not convinced of this. Either sanction would postpone Martin's release date. Unless the prospect of that postponement was a sufficiently troubling one for Martin, neither sanction would make him talk. The government points out, however, that only civil contempt may be purged by a change of heart.[11] While that distinction may be

an important one in coercing a free man, it will not be important to a prisoner who will remain confined in any event, particularly if he fears for his life.[12] The claim that he "carries the key to the jailhouse door in his pocket," United States v. Liddy, *supra* at 675, is totally specious in this context; compliance with the court order cannot bring his immediate release.

## B. THE PROCEDURAL SAFEGUARDS SURROUNDING THE USE OF CRIMINAL CONTEMPT SANCTIONS ARE PROPER WHEN A PRISONER IS ORDERED TO TESTIFY ABOUT THE CIRCUMSTANCES UNDERLYING HIS CONVICTION

Although the Supreme Court has held that the government can grant immunity after conviction, and thereby compel a convict to testify about the circumstances underlying his conviction, Reina v. United States, *supra*, there can be no doubt that this power is an awesome one. One does not have to believe that Piemonte v. United States, *supra*, was wrongly decided in order to recognize the dangers of abuse which Chief Justice Warren spelled out in his dissent:

> In my opinion, the Government has subjected the petitioner to unjustifiable harassment. The petitioner has been convicted for his admittedly illegal conduct and is presently paying his debt to society for that conduct. However, not being satisfied with this punishment, the Government sought to extract from the petitioner, under the threat of a contempt conviction, testimony which it could not have compelled at the original trial in 1958, and which it knows might well endanger

9. In United States v. Kelly, *supra*, a convicted defendant was sentenced to a civil contempt incarceration, but apparently at a time when he was free on the underlying criminal charge pending appeal.

10. Martin's civil contempt order was entered on February 20, 1973. Liddy's was dated April 3, 1973. *See* United States v. Liddy, *supra* at 670. Anglin was cited for civil contempt on June 20, 1973. *See* Anglin v. Johnston, *supra* at 1166.

11. *But see* United States v. DiMauro, *supra* at 431, where we upheld a criminal contempt sentence which had been imposed with the court's promise to consider subsequent compliance in ruling on any Rule 35 motion for reduction of sentence. *See also* United States v. Liddy, *supra* at 685 (MacKinnon, J., dissenting).

12. This was the reason which Martin gave for his silence.

petitioner's life and the lives of his loved ones. In my view, the Government's attempt to compel the petitioner to testify about conduct for which he has already been punished, and the District Court's imposition of an additional term in the penitentiary for petitioner's refusal to testify about such conduct represents the type of harassment which violates the spirit of the Double Jeopardy Clause of the Fifth Amendment. * * * I think it can fairly be said that the treatment which the petitioner has received from the Government and the District Court falls far short of that fundamental fairness which the Constitution guarantees and to which even the basest prisoner in the penitentiary is entitled. * * *

*Id.* at 564, 81 S.Ct. at 1725.[13]

The dangers inherent in the government's power to compel a convict to testify about his offense are demonstrated by the fact that it is possible that he may be doubly or even triply punished for his refusal to cooperate with authorities. In addition to the civil contempt imprisonment, the prisoner may already

have been punished for his noncooperation in his original sentencing. The judge may have taken the defendant's pretrial refusal to cooperate as a sign of lack of remorse and given him the maximum sentence partly for that reason.[14] *See* United States v. Hendrix, 505 F.2d 1233, 1236 (2nd Cir. 1974); Scott v. United States, 135 U.S.App.D.C. 377, 419 F.2d 264, 270 (1969); *id.* at 282 (Leventhal, J., concurring). If a prisoner's decision to "stonewall it" has led in fact to a stiffer original sentence, there is a disquieting measure of double punishment in what has taken place. At oral argument, government counsel conceded the possibility of a third "punishment," in that the contempt conviction will probably make it less likely that Martin will be given parole at an early date.

I would not hold that the double jeopardy clause makes no contempt punishment possible on the facts of this case. That issue is not before us. Moreover, my dissent has proceeded on the assumption that the criminal contempt sanction is available in cases such as this one, since that was the holding of the Supreme Court in Reina v. United States, *supra.*[15] Rather, what is suggested is

---

**13.** The Chief Justice concluded:

 I do not mean to imply that a person who is incarcerated may, for that reason alone, be excused from testifying before a grand jury. However, I do believe that he cannot be compelled to testify concerning the illegal activity for which he has been incarcerated. Piemonte v. United States, *supra* at 564, 81 S.Ct. at 1725 n. 4 (Warren, C. J., dissenting). *Compare* Reina v. United States, *supra* at 512–513, 81 S.Ct. 260 (convict need not even be given immunity to compel testimony about his crime, since he can no longer incriminate himself).

**14.** The problem of leniency to the cooperator is posed most acutely in instances of guilty pleas, for the absence of leniency to one who pleads not guilty has the troubling appearance of a burden on a constitutional right. *See* R. O. Dawson, Sentencing: The Decision As To Type, Length, and Conditions of Sentence 175, 177–181 (1969); Pilot Institute on Sentencing, 26 F.R.D. 231, 287 (1959). Yet leniency almost certainly enters in:

 * * * There is a natural, and I believe sound, disposition to adjust sanctions when

an offender admits his responsibility. This blends in with a readiness to accept the conclusion that such a person has the stuff that portends future improvement. I dare say that many judges, possibly the overwhelming majority, respond in this way, and I am not ready, at least as of this writing, to say that this approach is inadmissible. * * * Scott v. United States, 135 U.S.App.D.C. 377, 419 F.2d 264, 282 (1969) (Leventhal, J., concurring).

**15.** Nevertheless, there are grave questions of due process when a man is imprisoned for failure to testify about the facts underlying his criminal conviction. We delude ourselves if we do not recognize that the government is thereby permitted to accomplish in two steps that which cannot be undertaken in one step, given the Fifth Amendment. The technique is reminiscent of the Scottish legal practice described by Sir Walter Scott in *The Antiquary:*

 * * * "Nephew, it is a remarkable thing, that in this happy country no man can be legally imprisoned for debt."

 "Indeed, sir?" said M'Intyre; "I never knew that before * * *."

that the procedural safeguards required for the use of criminal contempt are not defects in that alternative, but are important protections which are appropriate in light of the dangers of government oppression inherent in post-conviction grand jury inquiries. My conclusion that the District Court lacked power to interrupt the criminal sentence in order to give effect to the civil contempt sanction is grounded in the belief that this result is not only required by statute, but is also wise policy.

## IV. THE POWER OF THE DISTRICT COURT TO ALTER THE RUNNING OF A CRIMINAL SENTENCE AT A TIME WHEN APPEAL HAS BEEN PERFECTED

Martin urges as an alternate ground for relief, that the District Court was without power to alter the running of the criminal sentence during a time when appeal had been perfected in this Court. This appears to me to be settled law. *See* Berman v. United States, 302 U.S. 211, 214, 58 S.Ct. 164, 82 L.Ed. 204 (1937); Keyser v. Farr, 105 U.S. 265, 266, 26 L.Ed. 1025 (1882); United States v. Liddy, *supra* at 686–688 (MacKinnon, J., dissenting); United States v. Grabina, 309 F.2d 783, 785 (2nd Cir. 1962), cert. denied, 374 U.S. 836, 83 S.Ct. 1885, 10 L.Ed.2d 1057 (1963).

The majority disposes of this contention by declaring that it "question[s] the applicability" of that settled law to this case because the civil proceeding was "entirely separate" from the prior criminal conviction. *Supra* at p. 910. At the same time, however, the Court holds that the cases were not so separate as to preclude the District Court's tinkering with the criminal sentence. I find this extraordinary. Either the District Court had jurisdiction to modify the criminal sentence *or* it did not—"jurisdiction is like that." United States v. Liddy, *supra* at 688 (MacKinnon, J., dissenting). Not a single case is cited for the majority's novel proposition that a District Court may alter a criminal sentence without obtaining jurisdiction over the criminal case. Even the District of Columbia's startling fiat that a trial court has jurisdiction to change the continuity of a sentence then on appeal, but not its term, *id.* at 676–677, recognized that the District Court had to have at least some jurisdiction over the criminal case.

I would hold that the civil contempt sentence, insofar as it ordered interruption of the criminal sentence, is a nullity, either on the ground that the criminal conviction was on appeal and hence not within the jurisdiction of the District Court, or on the ground that the District Court lacked power to interrupt the running of the criminal sentence for purposes of carrying out the order of civil contempt confinement.

"And if they arena confined for debt," said Ochiltree, "what is't that tempts sae mony puir creatures to bide in the tolbooth o' Fairport yonder?—they a' say they were put there by their creditors * * *."

\* \* \* \* \* \*

\* \* \* "You suppose, now, a man's committed to prison, because he cannot pay his debt? Quite otherwise: the truth is, the king is so good as to interfere at the request of the creditor, and to send the debtor his royal command to do him justice within a certain time—fifteen *days*, or *six*, *as the* case may be. Well, the man resists and disobeys; what follows? Why, that he be lawfully and rightfully declared a rebel to our gracious sovereign, whose command he has disobeyed * * *. And he is then legally imprisoned, not on account of any civil debt, because of his ungrateful contempt of the royal mandate. * * *"

\* \* \* \* \* \*

\* \* \* "[Y]ou are incapable of estimating the elegance of the legal fiction, and the manner in which it reconciles that duress, which, for the protection of commerce, it has been found necessary to extend towards refractory debtors, with the most scrupulous attention to the liberty of the subject."

"I don't know sir," replied the unenlightened Hector; "but if a man must pay his *debt or go to jail, it signifies* but little whether he goes as a debtor or a rebel, I should think. * * *"

*Id.* in Law in Action, An Anthology of the Law In Literature (R. Pound, editor, 1947) at 116–118.