UNITED STATES of America

v.

Bernard ULANO.

No. CR. 76–1382.

United States District Court,
C. D. California.

March 23, 1979.

As Amended May 7, 1979.

Andrea Sheridan Ordin, U. S. Atty., Robert Ramsey, Jr., Asst. U. S. Atty., Los Angeles, Cal., for Government.

Richard G. Sherman, Los Angeles, Cal., for Ulano.

## OPINION ON MOTION TO WITHDRAW PLEA OF GUILTY

BREWSTER, District Judge, By Designation.

The one count indictment in this case charges that the defendants, Bernard Ulano, Harry Franklin Ridgeway and others not identified, illegally conspired to distribute cocaine, a schedule II narcotic drug controlled substance, in violation of 21 U.S.C. § 846.

Each defendant, represented by his own employed counsel, pleaded guilty to the charge against him and was sentenced to a term in prison, to be followed by a statutory special parole term. Ridgeway accepted his sentence; Ulano is contesting his. Prior to being sentenced, Ulano changed lawyers and filed a motion for leave to withdraw his plea of guilty on the ground that it was not

knowingly and voluntarily entered. His motion was predicated on the following claims:

1. Within a few days after Ulano was indicted in November, 1976, one Ullo, a racketeer friend of his, told him that the trial judge was a cocaine user who could be "fixed" by a gift of a substantial quantity of high quality cocaine. Ulano entered into a conspiracy with Ullo to put over such a "fix" in this case. Ulano was to furnish the dope and Ullo was to arrange for the rest, claiming that he would use defense counsel, Edward I. Gritz, to make the direct contact with the trial judge,[1] with the idea that "the whole thing would be taken care of". After the entry of the plea about five months later, and before the imposition of sentence, Ulano found out that "there was no juice in the federal courts" and that there was no basis whatever for Ullo's claim that the judge could be corrupted.[2] Ulano did not want to go along with his guilty plea if there was no "fix".

2. He entered his plea around 10:30 A.M. on March 30, 1977. He claimed that he had received an injection of Demerol around 11:00 P.M. on the night before to relieve pain he was suffering from hemorrhoids, and that he was still under the influence of the drug and of pain to the extent that he was not fully cognizant of what he was doing when he entered his plea.

3. He did not receive effective representation from his employed counsel, Gritz, up to and including the time when his plea of guilty was entered.

Before the motion was acted upon, Ulano filed a motion to disqualify the trial judge upon the ground that the judge had become "personally involved in this matter". The asserted basis for that general allegation was the judge's expressions of resentment to then defense counsel, Sherman, about the statements in the first motion that he was a

---

1. As hereinafter appears, Gritz was not a party to the conspiracy and knew nothing about it until two or three days before May 2, 1978, the date first set for Ulano's sentence hearing, when Ulano had a taped telephone conversation with him.

2. The last two quotations in this paragraph are from Ulano's testimony on direct examination in the hearing on remand.

cocaine user and could be "fixed". The motion to disqualify set out some of those alleged statements. They were in terms that even a wayfaring man could understand.[3]

The trial judge refused to grant an evidentiary hearing on the motions, and overruled them.

The refusal to give him an evidentiary hearing was one of Ulano's primary complaints on appeal. After hearing oral arguments, the Court of Appeals entered the following order of remand:

"After considering the points raised on appeal, we remand the case to the district court directing that the sentence be vacated (relief which has been sought by the appellant) and the case be transferred to another judge to reconsider the motion to vacate the plea of guilty."

The undersigned, a Senior United States District Judge from the Fifth Circuit, was holding court under assignment in the Ninth Circuit at the time of the remand, and was designated to hear the motion.

After a full evidentiary hearing,[4] this Court has concluded that Ulano's motion to vacate his plea of guilty should be denied.

The indictment was returned on November 10, 1976. Ulano chose and employed Gritz to represent him. At his arraignment five days later, with Gritz present, Ulano entered a plea of not guilty. Ridgeway, represented by another attorney, also pleaded not guilty. The case was set for jury trial on January 18, 1977. After two continuances, the trial was ultimately set for March 29, 1977.

Ulano did not appear for trial on the date set. He called his attorney, Gritz, at about six o'clock that morning, and asked that a postponement of the trial be obtained on the ground that he was in severe pain from an attack of hemorrhoids that began the night before. When that request was presented, the Court ordered that a bench warrant issue for Ulano and that he be taken to the medical ward of the county jail for examination by an M.D. Federal officers took him in custody at his apartment at about 11:30 A.M., and transported him directly to the jail ward of the County Hospital at the University of Southern California Medical Center,[5] where he was registered in at 12:00 noon. The trial was rescheduled to begin the following morning, depending on the report of Ulano's attending doctor.

Ulano's hospital record showed that he claimed that his trouble started with rectal pain while he was working at a discotheque during the night before his case was to go to trial. The examining physician diagnosed his problem as "rectal prolapse—reducible", and had a consultation with other doctors on the staff to decide whether surgery was necessary. The determination was that surgery was not needed, and the rectal prolapse was reduced without it.[6] The doctor gave Ulano an intramuscular injection of 75 millimeters of Demerol before the reduction to keep him from suffering pain during the procedure. That injection was given at about 2:00 P.M. on March 29th, and was the only narcotic or anesthetic Ulano had on March 29th and 30th. After the reduction, he was moved to a jail ward in the hospital where he stayed until he went to court on the following morning. He suffered no acute distress after the re-

3. These remarks are not to be construed as intimating that the judge should not have resented the Ulano allegations about him.

4. The extent of the hearing is evidenced by the fact that the transcript of the proceedings covers almost 250 pages.

5. Ulano's hospital records were admitted in evidence in the hearing after remand. Reference is made to the following to give some indication of the caliber of medical attention Ulano received. The affidavit by the custodian of the records as to their authenticity is on the letter-

head of the County Hospital which says: "Department of Hospitals for Los Angeles County-University of Southern California Medical Center." It further states that the county institution "is affiliated with the University of Southern California Schools of Medicine, Dentistry and Pharmacy".

6. "Reduction of the prolapse" meant that the portion of the rectum which was unnaturally protruded was returned to place inside the body without surgery.

duction, and slept and rested well. He did not need a rectal ice pack for relief from pain during the night.

With his doctor's approval, Ulano was taken to court to face trial on the morning of March 30th.

Ulano met with his attorney, Gritz, shortly after he reached court at about 9:00 A.M., and learned that co-defendant Ridgeway, had decided to plead guilty. After a conference with Gritz, Ulano decided to plead guilty, too. Gritz recommended it and joined in Ulano's decision to change his plea.

■ The proceeding in which Ulano and Ridgeway each changed his plea to guilty began at 10:15 A.M. When the Judge was informed of the desires of the defendants to make such change, he went into a complete explanation of the nature of the charge, the maximum possible punishment, the rights of the defendants under the circumstances, and the consequences of a plea of guilty. He then engaged in a thorough, searching interrogation of each defendant and his counsel to determine whether such defendant was mentally competent to enter such a plea and whether his plea was voluntarily and understandingly entered and was factually supported. Before beginning such interrogation, he told the defendants, ". . . If at any time during the course of any statement I make or any questions I put to you, the statement or the question is unclear or you don't understand, I want you to interrupt me and speak up, or have your counsel interrupt and speak up, so that the record is quite clear here." Each defendant said he understood that. The questions were fair, and were designed for the purpose of trying to get at the truth.

At the conclusion of the explanation and interrogations, the Court asked Ulano: "How, then, again, do you plead, for the record, to the indictment, guilty or not guilty?" Ulano's response was, "I plead guilty." The Court thereupon made its detailed findings that Ulano's mentation was not affected by drugs or medicines, and that his plea was voluntarily and understandingly entered with full knowledge of the nature of the charge against him and the consequences of his plea. Ridgeway also pleaded guilty during the same proceeding. The pleas were accepted and the sentence hearing was set for May 2, 1977. They remained on bond pending the sentence hearing.

Ulano was in full possession of his faculties during all the period covering the occurrences on the morning of March 30th above set forth. The influence of the Demerol injection he had received about nineteen hours before could last a maximum of only four hours, and he was not under such influence to the remotest extent during the rearraignment proceedings. The sharp pain he was suffering the day before ceased when the rectal prolapse was reduced. While he was experiencing some discomfort from a residual soreness on the morning of March 30th, it was not severe and did not affect his mentation. He was alert and he fully understood the nature of the charge against him, the maximum possible punishment therefor, his rights under the circumstances, and the consequences of his plea of guilty.

Ulano's answers under oath to the questions propounded to him by the Court during the course of the proceeding positively refute the claims he is making as a basis for attacking the validity of his plea.

Shortly after the assignment of his case to a particular judge following his indictment on November 10, 1976, Ulano called Ullo and told him the identity of the judge. Ullo told him that the assignment of the case to that judge had been engineered by Gritz because the judge was a cocaine user and could be "fixed" by giving him a quantity of high quality cocaine. Ullo said that if they handled it that way, "the whole thing would be taken care of". Ulano entered into a conspiracy with Ullo to put over the "fix". Ulano was to furnish the cocaine and Ullo was to arrange to have the rest done. He told Ulano that he would have Gritz handle the direct contact with the judge. At first, Ullo told Ulano four ounces of cocaine would be needed. Later, the amount was increased to seven or eight

ounces. Ullo never called upon Ulano for the cocaine.

Ulano testified in detail about the scheme. Ullo was subpoenaed and called as a witness, but claimed his Fifth Amendment privilege and refused to testify.

When the subject of the "fix" was first mentioned in the conversation between Ullo and Ulano in November, 1976, Ullo told Ulano that Gritz had already approached the judge with an ounce of cocaine on behalf of Ullo, and that the judge angrily threw it on the floor because of its poor quality. Ulano made no claim of further discussions of the "fix" until the month of April, 1977. He testified that when he and Ullo talked about it during that month, the conversations were initially "pretty much the same as they had been before", until three days before Monday, May 2d, the date then set for sentence hearing, when Ullo told him: "It looks to me like that there's a possibility that we may not be able to do for you what we thought we would be able to do for you." On Monday, May 2d, Ulano contacted a lawyer, Richard Sherman, and employed him as his attorney in the matter from then on. He got a continuance of the sentence hearing for almost three months by changing lawyers.

Sherman told him at the outset that the idea that the judge could be "fixed" was preposterous, as "there was no juice in the federal courts at all", but that they ought to take steps to verify that there had been such a scheme as Ulano claimed. They decided to do that by recorded telephone conversations between Ulano and Gritz, and between Ulano and Ullo, with Ulano placing the calls and talking in a way to try to trap Gritz and Ullo into admitting matters that would show the existence of the scheme and their participation in it.

The first call was to Gritz on Saturday, April 30th. Gritz emphatically denied any knowledge of, or participation in, a scheme with Ullo to "fix" the judge. After talking

to Gritz, Ulano was convinced that he was telling the truth.[7] Defense counsel, Sherman, put the issue to rest with the following statement made in connection with Ulano's testimony about his taped telephone conversation with Gritz in the hearing on remand.

"MR. SHERMAN: First of all, this is an aside, there was never any contention by us that Mr. Gritz had any part in this. Mr. Gritz answered in a straightforward, honest manner, all questions."

The scheme to put over the "fix" had never been discussed between Ulano and Gritz prior to their telephone conversation on April 30, 1977 above described. Even though Ulano claims he thought Gritz had a vital role in the scheme that was claimed to have begun and been put into action during November, 1976, he never mentioned anything about it to Gritz until a month after he had pleaded guilty on March 30, 1977.

After the entry of his plea of guilty and prior to the time Ulano claims he found out that there would be no "fix", Ulano went to the Drug Enforcement Administration with Gritz and expressed his willingness to "squeal" about any information he had on drug traffickers in exchange for a deal to recommend leniency on his sentence. After questioning him, the Agents informed him that his answers appeared to be vague and untruthful and rejected his offer.

When Ulano and Sherman appeared for the sentence hearing on May 2, 1977, the Court granted Ulano's request that Sherman be substituted for Gritz as his attorney and postponed the hearing. On May 19, 1977, Ulano filed a motion prepared by Sherman asking leave to withdraw his plea of guilty on the grounds stated at the beginning of this opinion. Attached to the motion as exhibits were affidavits of Ulano and Sherman. The heretofore described motion to disqualify the judge was filed thereafter. The motions and Ulano's requests for evidentiary hearings thereon

---

7. The following is quoted from Ulano's testimony in the hearing after remand about the telephone conversation with Gritz:

"Your Honor, quite honestly I don't really remember the conversation verbatim. However, it did indicate that Mr. Gritz was entirely ignorant of what Mr. Ullo had told me."

were denied in a proceeding that took place on July 25, 1977 before the judge Ulano was seeking to disqualify. Ulano and Ridgeway were sentenced on July 28, 1977.

Ulano came to the hearing after remand relying upon the same three grounds to support his motion for leave to withdraw his plea of guilty as had been presented to the Court of Appeals. They are set out at the beginning of the opinion. He appears to have abandoned the one based on his Demerol injection, but has not expressly done so. This Court's findings and conclusions will therefore cover all three grounds.

The general rules relating to the withdrawal by a defendant of his plea of guilty before sentence are well-settled. Such of those rules as are applicable to this case and authorities supporting them are:

1. "A motion to withdraw a plea of guilty or *nolo contendere* may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his plea." Rule 32(d), F.R.Crim.P.

■ 2. The withdrawal of a plea of guilty is a privilege, not a right.

· "The court in exercise of its discretion will permit an accused to substitute a plea of not guilty and have a trial if for any reason the granting of the *privilege* seems fair and just." (Emphasis supplied). *Kercheval v. United States*, 274 U.S. 220, 47 S.Ct. 582, 17 L.Ed. 1009 (1927), which is frequently cited as one of the landmark cases on this subject.

*United States v. Stayton*, 3 Cir., 408 F.2d 559, 561 (1969), after quoting the above language from *Kercheval*, said: ". . . *Kercheval* was decided before the adoption of the Federal Rules of Criminal Procedure, but the quoted standard has continued as the guideline for judicial disposition of a pre-sentence motion to withdraw a plea of guilty . . . " citing, among other cases, *Nagelberg v. United States*, 377 U.S. 266, 84 S.Ct. 1252, 12 L.Ed.2d 290 (1964).

"We have uniformly held that a defendant has no *right* to withdraw a guilty plea under Rule 32(d), F.R.Crim.P. . . ." *United States v. Vasquez-Velasco*, 9 Cir., 471 F.2d 294 (1973). See also: *Everett v. United States*, 119 U.S.App.D.C. 60, 336 F.2d 979 (1964); *Callaway v. United States*, 10 Cir., 367 F.2d 140, 142 (1966); *Sherman v. United States*, 9 Cir., 383 F.2d 837 (1967); *United States v. Youpee*, 9 Cir., 419 F.2d 1340 (1969); *United States v. Webster*, 9 Cir., 468 F.2d 769 (1972); *Stayton,* supra.

■ 3. The granting of a presentence motion to withdraw a plea of guilty is within the sound discretion of the trial court. *Zaffarano v. United States*, 9 Cir., 330 F.2d 114 (1964), cert. den. 379 U.S. 825, 85 S.Ct. 52, 13 L.Ed.2d 35; *United States v. Fernandez*, 2 Cir., 428 F.2d 578 (1970); *United States v. Cook*, 9 Cir., 487 F.2d 963 (1973); *United States v. Barker*, 168 U.S.App.D.C. 312, 514 F.2d 208 (1976), cert. den. 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682; *United States v. Read*, 9 Cir., 534 F.2d 858 (1976); and *Kercheval, Everett, Stayton, Webster,* and *Vasquez-Velasco,* all supra.

". . . Overwhelming authority holds, as has this court, that withdrawal of a guilty plea before sentencing is not an absolute right but a decision within the sound discretion of the trial court which will be reversed by appellate court only for an abuse of that discretion." *Everett,* supra, 119 U.S.App.D.C. at 64, 336 F.2d at 983.

■ 4. Absent substantial prejudice to the court or the prosecution, leave to withdraw a plea of guilty prior to sentencing should be freely allowed whenever a defendant presents a plausible reason for doing so. *Kadwell v. United States*, 9 Cir., 315 F.2d 667 (1963); *Gearhart v. United States*, 106 U.S.App.D.C. 270, 272, 272 F.2d 499, 502 (1959); and *Zaffarano, Everett, Sherman, Stayton, Youpee* and *Read,* all supra.

". . . But Kadwell's importance, as the majority opinion recognizes, is its clear statement of the doctrine requiring that, absent substantial prejudice to the court or prosecution, withdrawal be allowed when-

ever a defendant presents a plausible reason for doing so. . . ." *Cook*, supra, 487 F.2d at 967. This quotation is taken from Judge Hufstedler's dissenting opinion, but there was no disagreement among members of the panel over the principle of law just quoted. It contains the best summary statement comment on the "freely allowed" principle laid down by *Kadwell* found during the legal research in this case.

". . . In cases where a motion to withdraw a plea of guilty is made, as here, before sentencing, the motion should be granted 'if for any reason the granting of the privilege seems fair and just.' *Kercheval v. United States*, 1927, 274 U.S. 220, 224, 47 S.Ct. 582, 583, 71 L.Ed. 1009. Generally speaking, a motion made before sentencing should be freely allowed. *Kadwell v. United States*, 9 Cir., 1963, 315 F.2d 667, 670. However, this is a matter within the discretion of the trial court, and we will not disturb the trial court's ruling denying the motion unless an abuse of discretion has been shown. . . ." *United States v. Erlenborn*, 9th Cir., 483 F.2d 165, at 168.

■ 5. The *Kadwell* "freely allowed" rule does not eliminate the discretion of the trial court in considering a motion before sentencing to withdraw a guilty plea. *Zaffarano, Everett, Sherman, Stayton, Youpee, Webster, Vasquez-Velasco* and *Read*, all supra.

"But *Kadwell* does not eliminate discretion in the District Court. The standard on review of a presentence ruling denying such a motion continues to be an abuse of discretion. . . ." *Sherman*, 383 F.2d at 840.

"It has long been clear that leave to withdraw a guilty plea should be freely granted prior to sentencing where there is a fair and just reason for doing so. *Kercheval v. United States*, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927); *Kadwell v. United States*, 315 F.2d 667 (9th Cir. 1963). It is equally clear, however, that withdrawal is not an absolute right and that the determination of whether it is to be permitted is committed to the sound discretion of the district court and will be reversed only for an abuse of that discretion. . . ."

*Webster*, supra, 468 F.2d at 771, citing *Sherman, Youpee* and *Everett*, all supra.

■ 6. In dealing with a presentence motion to withdraw a guilty plea, the district court's discretion must be exercised on the basis of sound information, soundly viewed. *Gearhart* and *Everett*, both supra.

In *Gearhart*, the Court, after recognizing the "freely allowed" rule, said:

"This is not to say that the District Court lacks all discretion in dealing with a motion of the present sort. But discretion must be exercised on the basis of sound information, soundly viewed. . ." 106 U.S.App.D.C. at 273, 272 F.2d at 502.

The above was quoted with approval in *Everett*, 119 U.S.App.D.C. at 63, 336 F.2d at 982, opinion by then Judge Burger, now Chief Justice Burger.

■ 7. A defendant seeking to withdraw a guilty plea before sentencing has the burden of presenting and supporting a valid reason for withdrawal. *United States v. Giuliano*, 2 Cir., 348 F.2d 217, 221 (1965), cert. den. 382 U.S. 946, 86 S.Ct. 406, 15 L.Ed.2d 354; *United States v. Lombardozzi*, 2 Cir., 436 F.2d 878, 881 (1971), cert. den. 402 U.S. 908, 91 S.Ct. 1379, 28 L.Ed.2d 648; *United States v. Michaelson*, 2 Cir., 552 F.2d 472 (1977); and *Everett, Callaway, Stayton, Fernandez, Webster, Cook*, all supra.

"A defendant seeking leave to withdraw a guilty plea prior to sentencing bears 'the burden of establishing grounds for the withdrawal'. . . ." *Everett*, supra, 119 U.S.App.D.C. at 65, 336 F.2d at 984, n. 17.

■ 8. The Rule 11 proceedings are a relevant subject for consideration in passing on a defendant's presentence motion for leave to withdraw his guilty plea. *United States v. Podell*, 2 Cir., 519 F.2d 144 (1975), cert. den. 423 U.S. 926, 96 S.Ct. 270, 46 L.Ed.2d 252; *Gearhart, Everett, Callaway, Sherman, Youpee, Fernandez, Webster, Cook* and *Barker*, all supra.

"This and other Circuits have always made a paramount object of their focus on this question the thoroughness of the Rule

11, F.R.Crim.P., personal inquiry made of the defendant by the trial judge during the taking of the guilty plea. See *United States v. Fragaso-Gastellum,* [456 F.2d 1287 (9th Cir.)] supra; *Vasquez v. United States,* 279 F.2d 34 (9 Cir. 1960); *United States v. Youpee,* supra; and *Everett v. United States,* 119 U.S.App.D.C. 60, 336 F.2d 979 (1964). . . ." *Cook,* supra, 487 F.2d at 965.

■ 9. In a hearing on a presentence motion to withdraw a guilty plea, the court should not attempt to decide the merits of a claim related directly to the merits of the charge against the defendant, thus passing on the question of his guilt or innocence.[8] *Gearhart,* supra, 106 U.S.App.D.C. at 272, 272 F.2d at 502. *Webster,* supra. However, where the motion raises issues that are only tangential in nature with no direct relation to the merits of the case, the court may hold an evidentiary hearing on such issues and determine whether they show a plausible reason for granting leave to withdraw the plea of guilty. *Gearhart,* supra, 106 U.S.App.D.C. at 272, 272 F.2d at 502.

". . . Where the accused seeks to withdraw his plea of guilty before sentencing on the ground that he has a defense to the charge, the District Court should not attempt to decide the merits of the proffered defense, thus determining the guilt or innocence of the defendant. In certain situations, where the issue raised by the motion to withdraw is one of tangential nature, resolvable apart from the merits of the case, the District Court may appropriately hold a factual hearing to determine whether the accused has a 'fair and just' reason for asking to withdraw his plea of guilty. . . . Under the circumstances presented in the instant case, we think it would be quite inappropriate for the District Court to hold an evidentiary hearing to determine the question of whether this accused was mentally ill at the time of the alleged offense. Such a hearing would go to the merits of the proffered defense and invade the province of the jury. . . ." *Gearhart,* supra, 106 U.S.App.D.C. at 273–274, 272 F.2d at 502–503.

When the facts of this case are weighed in the light of these principles, Ulano does not come close to showing a valid reason for withdrawal of his guilty plea.

Since the grounds for withdrawal urged in this case are tangential in nature and can be resolved apart from the merits of the case, the Court has held a full evidentiary hearing on all of them and will make a determination on the merits of each of them. The order in which they will be discussed has been determined by convenience.

The question of whether the defendant's mentation at the time he pleaded guilty was materially affected by his Demerol injection and by his pain from his rectal prolapse the day before will be discussed first, as the decision on that question will have an important bearing on the resolution of some of the other issues, such as the binding effect of Ulano's answers and statements during the Rule 11 inquiry.

Fact findings have already been made in the narrative statement in the opinion that during all the period covering the occurrences of the re-arraignment proceeding on March 30, 1977, Ulano's mentation was not affected to any degree by his Demerol injection or by pain. It was there pointed out that the plea of guilty was entered some time after 10:30 on the morning of March 30; that his rectal prolapse was reduced around 2:00 p. m. on March 29th, and that the only narcotic or sedative he received on the 29th and 30th was the one intramuscu-

---

**8.** Some matters mentioned in *Gearhart* and *Webster* indicate that the rule is not rigidly applied.

For instance, *Gearhart* says: ". . . If the Government urges that the defense is patently frivolous, a preliminary hearing might be justified. . . ." 106 U.S.App.D.C. at 273, 272 F.2d at 503.

In *Webster,* it was held that where evidence relevant to the defendant's claim related to the merits of the charge was also admissible on another issue not so related raised by the motion to withdraw, the court could properly receive and consider such evidence if the record showed explicitly that it was considered only for the legitimate purpose. 468 F.2d at 771.

lar injection of 75 millimeters of Demerol to lessen the pain during the reduction procedure; and that the effect of the Demerol was gone in four hours or less. The Court also found that the reduction gave Ulano quick relief from the sharp pain he was suffering up to that time, with the result that he suffered no further acute distress and rested and slept well during the night of the 29th. If he was suffering any pain on the morning of the 30th, it was in the nature of a residual soreness that did not affect his mentation.

These findings are supported by the medical records of Ulano's stay in the county hospital, the testimony of Sidney R. Adler, M. D., and by some of the testimony of attorney Gritz who was representing Ulano at the time of the entry of the plea. The Court also took into consideration the fact that Ulano's attending physician consented to his being taken to court for a jury trial.[9]

Dr. Adler had a part time position with Los Angeles County, and was also engaged in the practice of general psychiatry at his private office in the city of Los Angeles, from the time he went there in 1968. His position with the County was Chief of Drug Abuse Service, which dealt primarily with patients who came to the hospital for detoxification from alcohol and any type of drug. He said Demerol was a synthetic addictive narcotic used frequently pre-operatively and post-operatively for relief from pain. He had had broad experience with it, and had observed the effects of its legitimate and illegitimate use. The injection prescribed by a physician was usually from 50 to 150 milligrams, so the 75 milligrams injected intramuscularly into Ulano was not a large dose. He testified that the effects of such an injection lasted from 2 to 4 hours, and that in all his experience he had never seen a case where the effect had gone beyond four hours. Dr. Adler had studied Ulano's hospital records and said that on the morning of March 30th Ulano could not have been under the influence of the Dem-

erol injection he received about 20 hours before.

Dr. Adler testified that when a psychiatrist is trying to determine a person's mentation as of a particular time, it helps to know what he said and did then. When he finished his testimony on his first trip to the witness stand, he was given the transcript of the re-arraignment proceeding on March 30, 1977. He was called back to the stand after reading it, and testified that he was impressed by the directness and relevancy of Ulano's answers to the Court's questions during the Rule 11 inquiry. He said that he observed nothing that would indicate that Ulano was not in full possession of his faculties at that time.

Dr. Adler was a credible witness, competent in his field.

Ulano's present attorney, Sherman, must have been so impressed, too. After filing a brief in the Court of Appeals with several tear stained pages portraying Ulano as being helpless during the proceedings on March 30th due to his Demerol injection the day before and to the acute distress he thought Ulano was then suffering from having had a rectal prolapse 20 hours before such proceedings, he has in due frankness, after facing this overwhelming evidence, failed to press the point in the defendant's Memorandum of Points and Authorities filed in this Court after the evidentiary hearing on remand.

Ulano was not an unrepresented, ignorant, underprivileged or immature person. He was 44 years old. He lived in New York until 1973, where he was executive vice-president of a corporation that manufactured printers' materials. The company was sold in 1973, and Ulano got $1,300,-000.00 for his one-third interest. His then wife got $500,000.00 of that, and he went to California where he lived intermittently in 1973 and 1974. He became a resident of California in 1975. He became deeply involved in the cocaine racket—he claims only

---

9. Ulano had not decided to plead guilty at the time he left the hospital, so the doctor had to consider that he was probably facing a jury trial.

as a user [10]—and he says he had "blown" all of his $800,000.00 by the end of 1975 on cocaine and "related" activities.

█ With the determination that Ulano was in full possession of his mental faculties during all of the relevant occurrences on the morning of March 30th, the Court will now focus on the "thoroughness of the Rule 11, F.R.Crim.P. personal inquiry by the trial judge during the taking of the guilty plea." [11] The record of that proceeding discloses that the inquiries were complete and clear and covered all subjects pertinent to the plea, and that the judge ascertained with meticulous and painstaking care that Ulano was in full possession of his faculties and understood what he was doing and particularly the nature of the charge against him and the maximum possible penalty therefor, and the consequences of his plea; and that the plea was factually supported. The Court's findings relating to the requisites necessary to make Ulano's plea of guilty valid were dictated into the record at the time the plea was accepted. They are fully supported by the matters which had been developed by the Court's inquiries. The Rule 11 proceeding was not vulnerable in any particular.

█ As a result of the facts that Ulano was in full possession of his faculties during the entire re-arraignment proceedings, and that all requisites necessary to support a valid plea of guilty were met, he is bound by his answers and statements in response to the Court's questions during the Rule 11 inquiry. He cannot successfully urge as a ground for withdrawal of his plea claims that are positively refuted by such answers and statements. *Brady v. United States*, 397 U.S. 742, 758, 90 S.Ct. 1463, 1474, 25 L.Ed. 747 (1970).

Ulano's claim that his mentation was affected by the influence of his Demerol injection and by pain is belied by his responses during the Rule 11 inquiry that his mind was clear and his ability to understand the nature of the proceedings was not affected by the drug he had taken the day before.

. [12] His claim that he was ineffectively represented by his lawyer, Gritz, is belied by his answers to the Court's questions during the Rule 11 inquiry to the effect that he had had sufficient time to consult with his lawyer and was very much satisfied with his services.[12]

█ His claim that he was induced to enter a plea of guilty by Ullo's assurance that they could "fix" the trial judge by a gift of a substantial amount of cocaine was belied by his statements to the Court that no one had offered him any inducement of any kind to cause him to plead guilty, that his plea was entirely free and voluntary, and was being entered because he did in fact do the acts charged in the indictment.

*Jackson v. United States*, 5 Cir., 512 F.2d 772 (1975), announces the rule to be:

". . . Where the trial court has scrupulously followed Rule 11, F.R. Crim.P., the defendant is bound by his statements in response to that court's inquiry . . . ."

The courts applied that principle and held that defendants were bound by their responses to Rule 11 inquiries in *Gaxiola v. United States*, 9 Cir., 481 F.2d 383 (1973); and *Everett, Callaway, Sherman, Barker* and *Podell*, all supra.

The denial of Ulano's motion for leave to withdraw his plea of guilty is supported by

---

**10.** Ulano testified that he was only an intermittent user of cocaine when he was living in New York, and became a heavy user when he moved to California, where he sniffed about one-half an ounce a week. Ulano testified that during all of the period of the conspiracy alleged in the indictment, he had contact with large quantities of cocaine "for a user". There has never been any evidence that he was under the influence of cocaine at the time he pleaded guilty. He testified he kicked the habit when he was arrested on the conspiracy charge more than

six months prior to his re-arraignment and change of plea.

**11.** The quotation is from the opinion in *Cook*, supra, 487 F.2d at 965.

**12.** The following is quoted from the transcript of the Rule 11 proceedings:

"THE COURT: Are you satisfied with the representation that Mr. Gritz has given you in this case?

"DEFENDANT ULANO: Very much so."

this reason alone. Aside from this reason, the motion should be denied because there is no merit in any of the grounds urged by Ulano.

Ulano claims that he should be allowed to withdraw his plea of guilty because he received legally ineffective representation from his lawyer Gritz. Ulano's statements during the Rule 11 inquiry show that he thought then that Gritz had spent enough time with him on the case, and that he was very well satisfied with Gritz' services. Gritz became very upset when he learned from Ulano in a recorded telephone conversation about thirty days after the re-arraignment proceedings that Ulano thought Gritz was trying to help "fix" the judge by giving him a substantial amount of cocaine. He told Ulano he ought to get another lawyer, and Ulano employed Sherman. He began a course of irresponsible and reckless claims about Gritz' representation of Ulano which he should have known had no basis whatever in fact. They were just as irresponsible as those made about Ulano's "stuporous condition" [13] from pain and the Demerol injection.

The charges are summarized in the following language on pages 27–28 of Appellant's Opening Brief in the Court of Appeals:

"As may be seen from the statement of the case and the statement of facts herein, this appeal involves a situation in which the appellant, due to the ineffective aid of inexperienced counsel . . plead guilty to charges of which he believed he was innocent."

"Moreover, the appellant was denied the aid of counsel, who had little knowledge of federal court, did not adequately investigate the case . . .."

It was proved in the evidentiary hearing on remand that Gritz had been licensed to practice law in California and in the federal courts there since 1955; that criminal cases had made up about 80% of his practice; that he had handled an average of about ten cases a year in the federal courts over the preceding fifteen to twenty years; and that around 20% of his cases had been narcotics cases. Those facts rebut the claim that Gritz was inexperienced and had little knowledge of the practice in the federal courts.

The charge that Gritz did not adequately investigate the case was also rebutted by facts proved on the same hearing. Gritz had a discovery conference with an Assistant United States Attorney, Ulano and the DEA Agent present during the conference. With the permission of the AUSA, he listened to the tapes of the telephone conversations between Ulano and the undercover agent. He received for his file a copy of the investigative report and of the transcripts of the tape recordings. He had consulted with Ulano about the case before the discovery conference, and discussed the discovery material with him after the conference. He talked to Ulano in his office on several other occasions and at the courthouse on the morning when Ulano decided to change his plea.

The charge and the facts were not complicated. Ulano admits he agreed with Ridgeway to get some cocaine to be sold to the man who turned out to be a government undercover agent, and that he had several telephone conversations with the agent. Those conversations were recorded, so there could not have been any question as to what was said. Investigations of criminal cases by defense counsel are shortened considerably when the prosecution permits him to review the file and even gives him Xerox copies of the documents in the file. Gritz made an adequate investigation of the case.

Sherman says in his affidavit [14] filed in support of the motion to withdraw:

having almost supernal powers that enabled him to pass pulpit judgment on the quality of Gritz' representation of Ulano, and giving his opinion on certain legal questions. He does not say where he got that tremendous power.

**13.** The words quoted are from page 39 of Appellant's Opening Brief in the Court of Appeals.

**14.** For some reason, Sherman considered that he was hired to testify as well as to advocate, and filed an affidavit setting himself up as

"Some work in the file on certain motions showed that Gritz had 'an appalling lack of procedural knowledge related to the handling of matters in the United States District Court for the Central District of California.'"

Again, the facts proved in the hearing show that there is no merit whatever in this claim. The motions were prepared by a young man who was being permitted to work in Gritz' office while he was waiting to get the results of his bar examination. He was doing some legal research on Ulano's case, and prepared some motions to propose that Gritz file. He got the impression the case was in the state court and prepared the motions accordingly. Gritz put them in the file with no intention of using them. He did not throw them away because he "didn't want to make the kid feel bad."

None of these matters would ever have been urged in court if Sherman had asked Gritz for his explanation of them. He could have done that over the telephone.

Sherman takes Gritz to task for not filing a motion to suppress the fruits of the search of Ulano's residence. He swears in the affidavit that his opinion is that there was no probable cause for the issuance of the search warrant. From a casual examination, the Court does not agree with Sherman. The Special Agent of the DEA who was working in an undercover capacity and pretending to be a buyer of cocaine in large quantities made the affidavit for the search warrant. In the 4½ legal pages making up the warrant, he set out the details of his contacts with Ridgeway and Ulano regarding their sale to him of three kilos of cocaine with delivery to be made one kilo at a time for security reasons. The price was to be $52,000.00 each for the first two kilos and $46,000.00 for the third one. Prior to the time the affidavit was filed on the day the search warrant was issued Ulano told the affiant that he had some cocaine at his residence at 1510 Thayer Ave., Los Angeles, and that his suppliers were enroute to his house with the three kilos of cocaine. Ridgeway also told the affiant that the three kilos of cocaine were on the way to Ulano's house. As it turned out, the quantity of cocaine recovered by the officers during the search was minimal. Mrs. Ulano flushed the toilet when the officers arrived, and the only cocaine recovered was a white powder residue on a marble top in the bathroom and on other objects that could have been a user's paraphernalia. This Court is of the opinion that the facts stated in the affidavit were adequate to constitute probable cause.

The dab of cocaine and the user's paraphernalia were minor problems in the defense of the case. The tapes of the telephone conversations were devastating. Ridgeway's testimony, if he were called as a witness, would have given the Government more proof than it needed. There was no assurance that the government would use the evidence seized in the search. Gritz and Ulano thought that if they contested the case, they could explain that Ulano was only a user and not a seller, and that the fruits of the search would corroborate the claim.

A good lawyer does not object to all the vulnerable evidence offered by the opposition. There can be many benefits from following that practice. A common saying is that the mediocre lawyer asks himself, "What kind of motions *can* I file?" The good lawyer asks, "What kind of motions *should* I file?" Gritz had a judgment decision to make. Sherman is spooked by it.

The only other matter worth discussing is the contention that Gritz should not have permitted Ulano to plead guilty because of his continual assertion that he was innocent of the charges.

Ulano's assertion of innocence was flimsy under the facts. He could not deny the devastating evidence of his recorded telephone conversations with the undercover agent. Ulano attached much weight to the fact that the word "cocaine" was never mentioned in the conversations. He never mentioned the word in his recorded telephone conversations with Ullo around the end of April and the first of May, 1977, when he was trying to get him committed

to the fact that they had planned to "fix" the judge with cocaine. He referred to the eight ounces of cocaine as "eight of those things". As Ridgeway told him, when Ulano was talking about $50,000.00 a kilo, anyone would know he was not talking about apples and oranges.

Ulano said he was going along with the conspiracy just to help Ridgeway and that he had no intent of going through with it. Without deciding the question of whether that would have made him guilty of the charge, it is sufficient to say that there would have been considerable difficulty in getting a jury to believe that story.

■ The fact that Ulano protested his innocence does not carry much weight when the facts show he is guilty. There is nothing wrong in defense counsel advising his client of the possible consequences of a futile contest of his case. *Lattin v. Cox,* 10 Cir., 335 F.2d 397 (1966); *Cooper v. Holman,* 5 Cir., 356 F.2d 82 (1966); *Allen v. Rodriguez,* 10 Cir., 372 F.2d 116 (1967); *Rogers v. Wainwright,* 5 Cir., 394 F.2d 492 (1968).

When he got to the courthouse on the morning of March 30, Gritz learned that Ridgeway was going to change his plea to guilty. Ridgeway's lawyer said that Ridgeway had made no deal to testify against Ulano. He did not have to make a deal because he could have been compelled to testify regarding the transaction alleged in the indictment after he was convicted on the charge. *Reina v. United States,* 364 U.S. 507, 513, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960); *United States v. Romero,* 2 Cir., 249 F.2d 371 (1957); *United States v. Gernie,* 252 F.2d 664 (1958); *Podell,* supra, 519 F.2d at 148.[15] The government already had a devastating case with the recordings of the telephone conversations between Ulano and the undercover agent. With the possibility of Ridgeway's testimony added to that, Ulano did not have much choice. It is not uncommon for a guilty plea of a co-defendant to trigger similar pleas from other defendants. *Podell* and *Michaelson,* both supra.

Even if there had been the least question about Ulano's guilt, this was a case where a tactical plea of guilty had to be considered. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); *McCoy v. United States,* 124 U.S.App.D.C. 177, 179, 363 F.2d 306, 308 (1966). The following is quoted from *United States v. Barker,* supra, 514 F.2d, at 221:

> ". . . A guilty plea is very typically entered for the simple 'tactical' reason that the jury is unlikely to credit the defendant's theory or story. See *McCoy v. United States,* 124 U.S.App.D.C. 177, 179, 363 F.2d 306, 308 (1966). Indeed, so long as a factual basis for the plea exists, see Rule 11, Fed.R.Crim.P., a court may accept such a 'tactical' guilty plea even from a defendant who continues to assert his innocence. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Surely, such a defendant does not retain a right automatically to withdraw his plea. A guilty plea 'frequently involves the making of difficult judgments.' *McMann v. Richardson,* 397 U.S. 759, 769, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) . . .."

The modern standard now in use in most of the Circuits for evaluating effectiveness of representation of defense counsel was adopted for the Ninth Circuit in the landmark case, *Cooper v. Fitzharris,* 9 Cir., 586 F.2d 1325 (1978). After citing *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), *Cooper* went on to say:

> ". . . It was established that persons accused of crime are entitled not merely to counsel's presence but to effective assistance of counsel, and that effective assistance means assistance within the range of competence demanded of attorneys in criminal cases. . . ." (p. 1329)

Further quoting from *Cooper*:

> "The fact that counsel erred is not alone enough to establish a denial of the

---

**15.** ". . . Miller was charged with conspiring with Podell and making illegal payment to him. Once Podell pleaded guilty to accepting those payments, the Government could have called him as a most effective witness against Miller. . . ." *Podell,* 519 F.2d at 148.

constitutional right. This follows from the nature of the right itself. The Constitution does not guarantee representation that is infallible. The accused 'assumes the risk of ordinary error in either his or his attorney's assessment of the law and facts . . . .' " (p. 1330).

Gritz was retained as counsel by Ulano. One of the problems that soon developed under the new standard was whether ineffective assistance of counsel claims involving retained counsel had to be examined differently from those cases involving appointed counsel. See *Zuck v. Alabama,* 5 Cir., 588 F.2d 436 (1979). If they were not examined differently, a guilty criminal facing an almost sure conviction might be tempted to employ a mediocre lawyer so as to be sure to have at least several mistakes of his counsel to support a claim of ineffective representation. Recently, the Fifth Circuit faced the problem, and declared that the test for determining effective representation by retained counsel is: he must have been so grossly and obviously inefficient as to have rendered the proceedings fundamentally unfair. *Zapata v. Estelle,* 5 Cir., 588 F.2d 1017 (1979).

It is not necessary to speculate on what the Ninth Circuit will do about the question. Gritz' representation of Ulano was constitutionally effective under the general standard already laid down by such cases as *Cooper.* Ulano may have needed a magician, but the Constitution did not guarantee one for him.

▮▮▮ Ulano's last claim urged as a reason for withdrawal of his guilty plea is that Ullo's statements heretofore set out led him to believe that the judge was "fixed". The claim has several factual shortcomings, but it is not necessary to discuss them. The claim fails on legal grounds.

The claim is invalid because the government is not bound by it. Ullo and Ulano were the only ones actually involved in the scheme. Ullo had no connection with the government.[16]

It is well established that representations, promises or persuasion, not amounting to threats, by a person not connected with the involved prosecutorial agencies is not binding on the government in a criminal case, and that they will not furnish a basis for invalidating a plea of guilty. *Moore v. United States,* 5 Cir., 334 F.2d 25 (1964); *Johnson v. Smith,* 5 Cir., 414 F.2d 645 (1969); *United States v. Antoine,* 2 Cir., 434 F.2d 930 (1970); and *Fernandez,* supra.

*Moore* was an action to set aside a conviction on a plea of guilty on the ground that the plea was induced by a representation of his employed counsel that he would receive the 5 year statutory minimum sentence under the circumstances. The prosecution had no participation in the representation. The Court held that the plea was not invalid.

In *Johnson v. Smith, Warden,* 5 Cir., 414 F.2d 645 (1969), the petitioner in a habeas corpus action sought to set aside his state court conviction on the ground that his plea of guilty was involuntary because it was induced by an erroneous representation of his retained counsel about the admissibility of certain evidence which was to be offered if the case was tried. The Court held the ground urged by petitioner, even if true, would not justify setting aside the conviction. In that connection, the Court said at page 647:

"The District Court made no specific finding of fact on this issue but, 'assuming the truth' of Johnson's petition, found that 'in order for a wrong to be subject to redress under the Fourteenth Amendment it must result from *state action or, at the very least, the state must have some way of knowing of its occurrence.* Here this element is completely missing. Assuming without deciding the default or even the perfidy of retained counsel, his dereliction was in no wise chargeable to the State.' . . ." (Emphasis added)

---

16. Ullo was being investigated at the time of the hearing in this case by a strike force team from the Department of Justice. Ulano testified he was a racketeer. He had been indicted for murder shortly before the hearing. He used strong arm tactics resembling those of an "enforcer". Witnesses who knew him were afraid of him. But Ulano was devoted to him.

*Fernandez* was an action seeking leave to withdraw a plea of guilty. One ground urged for claiming that his plea was involuntary was that it "was induced by the advice of a fellow inmate that after the plea he would be moved to a more comfortable place of detention." In rejecting his claim, the Court said: ". . . Of course, the Government is not responsible for the action taken by Fernandez on the advice of fellow inmates." 428 F.2d at 580.

Ulano's counsel argues that this cannot be the law. He says that if Ulano had plead guilty by reason of a third party's threat of serious bodily harm to him or his family, the plea would be invalid even though the person making it had no connection whatever with the government. Without getting into a discussion about what kind of action by such a third party would be necessary to invalidate a plea of guilty, this argument can be disposed of by pointing out a fundamental distinction between the hypothetical case and the nefarious scheme in this case. Here, Ulano himself was a participant in the skulduggery. To agree with him would be to permit him to take advantage of his own wrong.

Recognition of the validity of this claim would put the courts at the mercy of the underworld. They could get together in every case involving their ilk, and make some kind of promise or representation concerning the penalty on a plea of guilty; and the defendant could manipulate the case by pleading guilty with an assurance that the conviction could be set aside if the sentence did not suit him.

Ulano did not change his plea on arraignment date or at a time specially set for it. He changed it at the last minute on the day the Court had set his case for jury trial. That meant he beat some other defendant out of a place on the trial docket for that day. He got a continuance to which he was not entitled. Besides wasting judicial resources, his charges about "fixing" the judge could undermine respect for the courts. There is no equity in his claim.

The following quotation from *Everett* is applicable here:

"The record reveals a guilty plea, intelligently and voluntarily made with assistance of retained counsel and candid admission of all essential elements of the crime in open court; this is hardly a predicate for an appellate holding that the District Judge abused his discretion in refusing to permit a withdrawal. We are not disposed to encourage accused persons to 'play games' with the courts at the expense of already overburdened calendars and the rights of other accused persons awaiting trial, whose cases may lose their position on the calendar and the Court's time and facilities which are thus diverted for no useful purpose."

An order will be entered overruling Ulano's motion to withdraw his guilty plea.