# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs January 27, 2004

## STATE OF TENNESSEE v. MICHAEL WAYNE POE

**Appeal from the Criminal Court for Hamilton County**
**No. 237715      Douglas A. Meyer, Judge**

---

### No. E2003-00417-CCA-R3-CD - Filed July 19, 2004

---

Indicted for aggravated child abuse, the defendant, Michael Wayne Poe, was convicted by a jury of child abuse, a Class D felony.  The trial court sentenced the defendant to four years, with all but 11 months, 29 days suspended.  In this appeal of right, the defendant argues that the evidence was insufficient, that the sentence was excessive, and that the trial court erred by denying full probation. The sentence is modified to three years; otherwise, the judgment of the trial court is affirmed.

### Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed

GARY R. WADE, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Ardena J. Garth, District Public Defender; and Donna Robinson Miller (on appeal), Karla Gothard (at trial), and William Dobson (at trial), Assistant District Public Defenders, for the appellant, Michael Wayne Poe.

Paul G. Summers, Attorney General & Reporter; John H. Bledsoe, Assistant Attorney General; and Yolanda Mitchell, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On the evening of April 1, 2001, Dr. Ralph Smith, an emergency room physician at T.C. Thompson Children's Hospital, treated the twelve-day-old victim, Taylor Poe, who appeared lethargic, had multiple bruises and abrasions, and cried out in pain when touched.  Dr. Smith detected bruising and tearing to the rectum, as well as some purulent discharge, all consistent with digital anal penetration.  A spinal tap ruled out meningitis and blood testing excluded any other bacterial infection.  Dr. Smith found fractures of the right ninth, tenth, and eleventh ribs.  There were also fractures of the left eleventh and twelfth ribs, the left clavicle, and the right tibia.  It was Dr. Smith's opinion that the injuries were not accidental or self-inflicted and were instead the result of child abuse.

Dr. Patrick Francis Keegan, who later admitted the victim into the hospital's pediatric intensive care unit, concluded that the rib fractures would have required application of a "significant amount of force" and that the tibia fracture, which was spiral, would have required a rotational force far more significant than would be applied during a diaper changing. Because Dr. Keegan found no family history of bone or bleeding abnormalities, it was his opinion that the injuries were the result of abuse.

In an examination conducted days before the injuries were discovered, Dr. Michael Estep, a pediatrician, found that the eight-day-old victim looked "generally well" but had some redness in the diaper area and a fissure, or tear, at the anal opening. Dr. Estep recommended discontinuation of the use of baby wipes and application of diaper rash ointments.

Dr. Blaze Baxter, a radiologist at T.C. Thompson Children's Hospital, described the victim's fractures as "acute" and stated that there were two additional fractured ribs not previously identified by Dr. Smith. It was Dr. Baxter's conclusion that the victim sustained "classic [abuse] injury patterns."

Kevin Akins, a detective with the Chattanooga Police Department child abuse unit, testified that he arrived at the hospital shortly before midnight, just prior to the arrival of the defendant, the victim's biological father. Detective Akins recalled that the defendant, who appeared "extremely nervous" and "jittery," initially denied any knowledge of the victim's injuries. Later, in a recorded statement that was played for the jury at trial, the defendant contended that the night before the victim's hospitalization, he and his wife, Rachel Poe, had returned to their residence in separate vehicles at about 10:20 p.m. Ms. Poe had returned with the victim from the residence of her sister, Donna Ensley. After informing the detective that the family was asleep when the victim awoke crying at about 2:00 a.m., the defendant claimed that he "took [the victim] in the front room and rocked him in the rocking chair, and . . . might have put that bruise on [the victim] because [he] patted [the victim] too hard or something." The defendant told the detective that after the victim had fallen asleep and been put back down, he again awoke crying:

> "And then he started crying again, so I went back to get him and sit down with him. Gave him a bottle again and he wouldn't, he wouldn't go to sleep or quit crying and all. I guess probably I was done in a cuss rage about that time and maybe patting – patted him too hard."

The defendant acknowledged that he probably pulled the victim's leg too hard while changing his diaper or sleeper and conceded that he had shaken the victim. Detective Akins, who described the defendant as cooperative throughout the investigation, ruled out sexual abuse as the cause of the injuries and ultimately initiated a charge of felony child abuse.

Rachel Poe, who had been married to the defendant for approximately three years when she became pregnant with the victim, testified at trial that the defendant was initially happy when he learned of her pregnancy but grew increasingly argumentative, insisting that "the baby wasn't his and

[she] was sleeping with anybody and everybody." She recalled that when she was approximately eight months pregnant, the defendant became angry and tried to hit her in the stomach with his fist. Explaining that she had sustained extensive vaginal tearing during the victim's birth, Ms. Poe testified that she was unable to move around without assistance and required help caring for the victim. She explained that while her mother and sister assisted her when they could, the majority of the victim's care was left to the defendant. According to Ms. Poe, the defendant, who worked the second shift, would awaken the victim at approximately 1:00 a.m. and keep the victim awake until he himself went to bed, generally between 7:00 and 9:00 a.m. She stated that on the day before the victim's first hospitalization, the defendant had deviated from his usual course and allowed the victim to sleep during the night. Ms. Poe testified that on that day, she had gone to the residence of Donna Ensley to give the victim his first bath, returning to her residence at approximately 10:20 p.m.

Ms. Poe testified that when she awoke at approximately 7:00 a.m. on April 1st, the date of the hospitalization, the defendant was in the kitchen with the victim, who was crying. She recalled that the defendant, who instructed her to prepare a bottle while he changed the victim's diaper, then remarked to the victim, "All you want to do is damn cry all the time." After she saw some bruising on the victim's face and asked how it had occurred, the defendant explained that the victim liked to swing his arms and had probably injured himself in his sleep. Ms. Poe remembered that later in the day when her parents visited, her mother observed additional bruising and noted that the victim cried when touched. Ms. Poe testified that she took the victim to the emergency room, fearing that he had hemophilia. Shocked to learn that medical personnel suspected child abuse, Ms. Poe recalled that the defendant, who did not travel to the hospital emergency room with her and her family and arrived hours after admission, had previously denied dropping the victim. Ms. Poe testified that she did not cause any injury to the victim.

Gladys Skiles, Rachel Poe's mother, visited the Poe residence with her husband early in the afternoon prior to the victim's hospitalization. Ms. Skiles testified that when she changed the victim's diaper, she observed blood and mucous coming from his rectum. When she and Ms. Ensley bathed him, she noticed bruises on his body. Ms. Skiles recalled that when they decided to take the victim to the hospital, the defendant appeared nervous and declined to accompany them.

Donna Ensley confirmed that when she gave the victim his first bath on March 31, she did not notice any problems or crankiness. She recalled that on the next day, the victim, who was crying inconsolably and "really really fussy," had bruises "everywhere." She described his rectum as being "messed up." Ms. Ensley testified that the defendant did not express concern and denied having dropped the victim.

The twenty-six-year-old defendant, testifying in his own defense, claimed that he and Ms. Poe had separated several times during the course of their marriage because Ms. Poe "changed a whole lot" and "want[ed] to fight with [him] all the time and run [him] off." Employed as a welder at the time of his arrest and working seven days a week, ten hours per day, the defendant claimed that he had returned to his residence at approximately 10:30 p.m. on the evening of March 31 and that his wife expressed concern that the victim had been injured while she and her sister were bathing

him. The defendant testified that when the victim awoke at approximately 2 or 3:00 a.m., he was unable to awaken Ms. Poe and found the victim "screaming and hollering." He contended that he changed the victim's diaper, sang him to sleep, and put him back in his crib. According to the defendant, he and Ms. Poe first noticed bruises on the victim the next morning. He denied having caused the injuries. During cross-examination, the defendant acknowledged that on every other evening after the birth of the victim, he had awakened him upon his return from work.

I

Initially, the defendant argues that the state failed to prove venue. The state asserts that the proof at trial established that the offense occurred in Hamilton County.

Article I, section 9 of the Tennessee Constitution provides that in all criminal prosecutions by indictment or presentment, the accused has a right to a speedy, public trial by an impartial jury of the county in which the crime was committed. Tenn. Const. art. I, § 9; see also Tenn. R. Crim. P. 18. The state must prove that the offense was committed in the county of the indictment. Harvey v. State, 213 Tenn. 608, 612, 376 S.W.2d 497 (1964). Because venue, a question for the jury, is not an element of the offense, it need be established only by a preponderance of the evidence. Hopper v. State, 205 Tenn. 246, 326 S.W.2d 448 (1959); State v. Hamsley, 672 S.W.2d 437, 439 (Tenn. Crim. App. 1984); State v. Baker, 639 S.W.2d 670, 672 (Tenn. Crim. App. 1982). Slight evidence, including circumstantial evidence, will be sufficient if the evidence is uncontradicted. State v. Bennett, 549 S.W.2d 949 (Tenn. 1977). The jury is entitled to draw reasonable inferences from the evidence. State v. Johnson, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984).

Proof in the record established that the defendant committed the offense at his residence at 4212 14th Avenue. The victim was taken to a hospital in Chattanooga. The Chattanooga Police Department investigated the crime. Sufficient uncontradicted circumstantial evidence may support a finding by a preponderance of the evidence that the offense occurred in the county of indictment. Based on these facts, a reasonable jury could have found by a preponderance of the evidence that the offense was committed in Hamilton County. See State v. Gregory Lavell Carson, Sr., No. M1999-00315-CCA-R3-CD (Tenn. Crim. App., at Nashville, Mar. 31, 2000).

II

Next, the defendant contends that the evidence was insufficient to support the conviction. The state disagrees.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).

Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

A criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 456-58 (1958); State v. Hailey, 658 S.W.2d 547, 552 (Tenn. Crim. App. 1983). If entirely circumstantial, the facts and circumstances must "be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610, 612 (1971). In such an event, the circumstantial evidence must be both consistent with guilt and inconsistent with innocence. Pruitt v. State, 460 S.W.2d 385, 3990 (Tenn. Crim. App. 1970). The weight of the circumstantial evidence is for the jury to determine. Williams v. State, 520 S.W.2d 371, 374 (Tenn. Crim. App. 1974) (citing Patterson v. State, 4 Tenn. Crim. App. 657, 475 S.W.2d 201 (1971)). The court may not substitute its inferences for those drawn by the trier of fact in circumstantial evidence cases. Liakas, 286 S.W.2d at 859; Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). The same standard of review is applicable whether the guilty verdict was based upon direct evidence or upon circumstantial evidence. State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 208 Tenn. 75, 343 S.W.2d 895, 897 (1971).

In this case, the defendant was convicted of Class D felony child abuse, defined by statute as follows:

> Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, however, that if the abused or neglected child is six (6) years of age or less, the penalty is a Class D felony.

Tenn. Code Ann. § 39-15-401(a). "'Knowing'" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-106(a)(20).

Here, evidence established that the victim had sustained at least six broken ribs, a broken clavicle, a broken tibia, bruises, abrasions, and rectal tearing. Drs. Smith and Keegan, the emergency room physicians who treated the victim, testified that it was their opinion that the victim's injuries were not accidental and were the result of child abuse. Because Ms. Poe was physically disabled from birth-related complications, the defendant was charged with primary responsibility for the victim's care when neither Ms. Skiles nor Ms. Ensley was present. The victim sustained rectal tearing and had to be taken to a doctor shortly before his emergency room visit. Ms. Skiles testified that she had observed the defendant "digging" his finger into the victim's rectum while using a wipe

-5-

to clean him during diaper changing. The defendant, who initially denied any knowledge of the victim's injuries, ultimately admitted to investigating officers that he may have caused some of the broken bones and bruising while "patting," pulling, or changing the diapers of the twelve-day-old victim. He was described as "nervous" and "jittery" during the interview. That the defendant declined to accompany other family members to the hospital suggested either a fear of detection or a lack of concern, either of which qualified as especially suspicious behavior under the circumstances. The medical evidence was particularly unfavorable to the defense. There were multiple injuries and they were particularly severe. Moreover, all hypotheses other than the guilt of the accused had been eliminated by the evidence offered by the state. See Crawford, 470 S.W.2d at 612. Every other person who had access to the child denied responsibility. The jury was entitled to accredit the testimony of the state's witnesses and otherwise make reasonable inferences from the proof. This court has a limited scope of review on appeal. In our view, a rational jury could have determined from the circumstantial evidence that the defendant was guilty of Class D felony child abuse.

III

The defendant next asserts that the trial court erred by ordering a four-year sentence, contending that he is entitled to the minimum sentence of two years.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

At the sentencing hearing, Rachel Poe testified that the defendant, from whom she was divorced fourteen months after the victim was hospitalized, was unemployed and receiving SSI benefits "because he could not read or write very well" at the time of their marriage. She recalled that he began behaving differently about a year into their marriage, after he went to work because he "didn't like the idea" that she was working when he was not. Ms. Poe related that the defendant became argumentative and turned physically violent, attacking her and breaking things in the home

during fits of anger. She testified that he drank alcohol and "popped" pain pills that he had obtained from his parents, exacerbating the situation. Ms. Poe maintained that although the defendant would "help out" from time to time, the majority of the household expenses were paid by either her or her parents. She related that her parents "paid the house out of foreclosure twice" and purchased their groceries and that her sister had bought them a car. According to Ms. Poe, the defendant used the money he earned to pay for his truck he had purchased and help with his parents' expenses. She testified that on the afternoon they took the victim to the hospital, the defendant refused to accompany them, telling her that he "wanted to stay home and talk to the big man upstairs." Ms. Poe claimed that Erlanger Medical Center had filed suit against her for $10,497 in unpaid medical bills relating to the victim's hospitalization. She stated that the bills were sent to the defendant's residence but were ignored. She complained that the defendant, who had been ordered to pay $100 biweekly in child support, had paid only $150 in total during the past seven months. Ms. Poe testified that right after she and the defendant were married, her cousin spent $150 on reading lessons for the defendant, who stopped attending after two sessions. She asked that the court impose the maximum sentence.

Gladys Skiles testified that she attempted to teach the defendant proper diaper changing after she observed him "digging his finger into [the victim's] . . . rectum," thereby causing tearing, while cleaning the child. She was unsure whether he had ever heeded her instructions. Ms. Skiles recalled that on one occasion while she was at her daughter's residence prior to the victim's birth, the defendant received a telephone call during which he cursed and threatened the caller. When Ms. Poe asked the defendant to calm down, the defendant "slammed" her against a wall and left the residence, knocking Ms. Skiles into a wall as he did so. Ms. Skiles testified that although Ms. Poe maintained regular employment, the defendant did not. She and her husband paid their rent "several times," paid "the house out of foreclosure three times," and purchased a van for them to drive to and from work. She testified that since the offense, Ms. Poe had learned to drive and had obtained a job, making $8.56 per hour. According to Ms. Skiles, the victim, now eighteen months old, still drags his feet sometimes when he walks. She admitted that in the past she was angry with the defendant because he had lied about being a preacher. Ms. Skiles nevertheless stated that she wished the defendant and Ms. Poe could have worked out their problems.

Donna Ensley testified that she initially told the defendant to remain at the residence while they took the victim to the emergency room. She contended, however, that Ms. Poe and Ms. Skiles "begged" him to accompany them.

James Welch met the defendant at church and had known him for approximately ten years. He testified that he once saw the defendant, while in a fit of rage, throw a pulpit and Bible out the back door of his residence.

The defendant, who at the time of the sentencing hearing resided alternately with his mother and father, testified that his father, due to illness, was unable to attend the hearing but pointed out that both his mother and sister were present. He stated that he had attended special education classes in school until the ninth grade before dropping out. The defendant testified that afterward, he lived

with his parents, helping out around the house and assisting neighbors. Claiming that he was unable to read or write, the defendant stated that he received SSI benefits at that time and had continued to receive benefits until he married Ms. Poe, at which point he "felt like [he] needed to better [himself] and . . . support [his] wife." While the defendant agreed that his work history was sporadic, he explained that he had difficulty maintaining steady employment due to some health problems and his absences for attorney appointments and court appearances in connection with this case. He denied using alcohol but acknowledged that he "backslid once" for about a month "a couple years back." He also denied having ever obtained any pain pills from his parents. The defendant testified that he had been medicated for depression and anxiety but that he quit taking the medication because it made him "feel weird and funny." He claimed that he had enrolled in READ of Chattanooga in hopes of acquiring a GED. He also testified that he would catch up on his back child support and that he had been attending parenting classes. When asked whether he admitted responsibility for the victim's injuries, the defendant stated, "[I]f I did do those things, I didn't mean to do them intentionally . . . trying to be mean or anything like that." The defendant acknowledged that he had remarried eight days after his divorce from Ms. Poe.

At the close of the hearing, the trial court applied enhancement factors (2), that the defendant has a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range, and (16), that the defendant abused a position of private trust, but assigned little weight to those factors. See Tenn. Code Ann. § 40-35-114(2), (16) (1997). It appears that the trial court considered as mitigating factors that the defendant had strong family support, had a learning disability, had the ability to obtain and maintain employment, did not have a history of violent offenses, had a child to support, had a limited education, and contributed to the financial support of his disabled parents. See Tenn. Code Ann. § 40-35-113(13).

In this appeal, the defendant argues that the trial court erred by finding any enhancement factors. Specifically, he contends that his single prior misdemeanor conviction for driving under the influence was not sufficient to warrant application of enhancement factor (2). In State v. Milton S. Jones, Jr., No. 02C01-9503-CR-00061 (Tenn. Crim. App., at Jackson, March 7, 1997), however, this court approved the application of the previous criminal history enhancement factor based on a misdemeanor conviction for exhibiting pornography to minors. Our rulings in Jones and other cases support application of the factor, to which the trial court appropriately assigned only little weight.

The defendant does not make any specific argument as to why enhancement factor (16), that he abused a position of private trust, should not have been applied. That omission often results in a waiver. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument . . . will be treated as waived in this court."). He does contend, however, citing State v. Dykes, 803 S.W.2d 250 (Tenn. Crim. App. 1990), that the trial court erroneously considered a non-statutory enhancement factor when it determined that the defendant lacked candor in his testimony. While, as set forth below, lack of candor may be an appropriate alternative sentencing consideration, it is not included in the enhancement factors enumerated in Code section 40-35-114 and should not have been used as such by the trial court to enhance the sentence. Nevertheless, enhancement factor (5), that the victim was particularly vulnerable because of age, is supported by the record. See Tenn.

Code Ann. § 40-35-114(5); State v. Walton, 958 S.W.2d 724, 729 (Tenn. 1997) (stating that "age, as an essential element of the offense, does not preclude application of the 'particularly vulnerable' enhancement factor"). Because of his age, twelve days old, the victim would have been unable to resist, to summon help, or to testify later about the crime. See id. Thus, any error by the reference to lack of candor in establishing the length of the sentence was rendered harmless by our application of this additional factor.

The defendant also contends that the trial court erred by refusing to apply statutory mitigating factors (3), that substantial grounds exist tending to excuse or justify his criminal conduct, and (11), that he committed the offense under such unusual circumstances that it is unlikely that he was a motivated by a sustained intent to violate the law. See Tenn. Code Ann. § 40-35-113(3), (11). He does not, however, point to any facts or circumstances in the record that would support the application of those factors. In our view, the trial court properly declined to apply them.

In summary, the following enhancement factors are applicable: (2), that the defendant has a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range; (5), that the victim was particularly vulnerable due to his age; and (16), that the defendant abused a position of private trust in committing the offense. See Tenn. Code Ann. § 40-35-114(2), (5), (16). The defendant is entitled to some mitigation due to the support of his family, his ability to obtain employment, his lack of a violent offense record, need to support the victim, and his financial support of his parents. See Tenn. Code Ann. § 40-35-113(13).

A Range I sentence for a Class D felony is two to four years. See Tenn. Code Ann. § 40-35-112(a)(4); see also Tenn. Code Ann. § 39-15-401(a). Under Tennessee law, there are three applicable enhancement factors and several applicable "catch-all" mitigators. In our view, the trial court correctly assigned little weight to enhancement factor (2), which involved a prior misdemeanor conviction. Enhancement factors (5) and (16) would also be entitled to weight. The victim was less than two weeks old and, because his mother was physically unable to provide the necessary care, he was largely at the mercy of the defendant. The injuries were severe. It is also our view that the applicable mitigating factors would be entitled to little weight in the context of all circumstances. Accordingly, the trial court, under the terms of the 1989 Act, did not err by setting the defendant's sentence at the four-year maximum.

The United States Supreme Court's recent opinion in Blakely v. Washington, 542 U.S. ____, 2004 U.S. LEXIS 4573 (2004), however, calls into question the continuing validity of portions of our statutory sentencing scheme. In that case, the high court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. at **13-14 (emphasis in original). Finally, the Court concluded that "every defendant has a right to insist that the prosecutor prove to a jury all facts legally essential to the punishment." Id. at *31 (emphasis in original).

Under our 1989 Act, the presumption is the minimum sentence for a Range I, Class D felony. That is two years. That the defendant had a prior conviction is acknowledged and may be applied under Blakely. See Tenn. Code Ann. § 40-35-114(2). Factors (5), that the victim was particularly vulnerable due to age, and (16), abuse of a position of private trust, have not been submitted to a jury and have not been admitted by the defendant. The rule in Blakely precludes application of either factor. Because there is a single enhancement factor, the sentence must be modified to three years.

IV

Finally, the defendant claims that the trial court erred by denying total probation. Especially mitigated or standard offenders convicted of Class C, D, or E felonies are, of course, presumed to be favorable candidates "for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). With certain statutory exceptions, none of which apply here, probation must be automatically considered by the trial court if the sentence imposed is eight years or less. Tenn. Code Ann. § 40-35-303(b) (Supp. 2001). The trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof. State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). When, as here, the defendant is entitled to the statutory presumption favoring alternative sentencing, the state must overcome the presumption by the showing of "evidence to the contrary." Ashby, 823 S.W.2d at 169; State v. Bingham, 910 S.W.2d 448, 455 (Tenn. Crim. App. 1995), overruled in part on other grounds by State v. Hooper, 29 S.W.3d 1 (Tenn. 2000); see Tenn. Code Ann. §§ 40-35-102(6), -103. Conversely, it is the defendant who has the burden of demonstrating his suitability for total probation. Bingham, 910 S.W.2d at 455; see Tenn. Code Ann. § 40-35-303(b) (Supp. 2001).

Among the factors applicable to probation consideration are the circumstances of the offense, the defendant's criminal record, social history and present condition, and the deterrent effect upon and best interest of the defendant and the public. State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978). The nature and circumstances of the offense may often be so egregious as to preclude the grant of probation. See State v. Poe, 614 S.W.2d 403, 404 (Tenn. Crim. App. 1981). A lack of candor may also militate against a grant of probation. State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983).

Moreover, in Ashby, our supreme court encouraged the grant of considerable discretionary authority to our trial courts in matters such as these. 823 S.W.2d at 171; see State v. Moss, 727 S.W.2d 229, 235 (Tenn.1986). "[E]ach case must be bottomed upon its own facts." State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987). "It is not the policy or purpose of this court to place trial judges in a judicial straight-jacket in this or any other area, and we are always reluctant to interfere with their traditional discretionary powers." Ashby, 823 S.W.2d at 171.

In this case, the trial court did not place its alternative sentencing considerations on the record. Nevertheless, it is our view that the trial court did not abuse its discretion by requiring the defendant to serve 11 months, 29 days of his four-year sentence in incarceration. Before a trial court may deny an alternative sentence based upon the circumstances of the offense, those circumstances "must be 'especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an

excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring [an alternative sentence]." State v. Cleavor, 691 S.W.2d 541, 543 (Tenn. 1985); State v. Hartley, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991). The proof established that the victim sustained serious bodily injury as a result of the offense. The defendant, originally charged with aggravated child abuse, was granted leniency by the jury in the form of a conviction for the lesser offense of child abuse. In our view, to further lessen his sentence would depreciate the seriousness of the offense.

Further, lack of candor is an appropriate consideration. "A defendant's truthfulness or mendacity while testifying on his own behalf, almost without exception, has been deemed probative of his attitudes toward society and prospects for rehabilitation and hence relevant to sentencing." United States v. Grayson, 438 U.S. 41, 51 (1978). "'[A] fact like the defendant's readiness to lie under oath before the judge who will sentence him would seem to be among the more precise and concrete of the available indicia.'" Id. (quoting United States v. Hendrix, 505 F.2d 1233, 1236 (2nd Cir. 1974)). Here, the trial court specifically found that the defendant lied under oath. It is our view that the lack of candor, when combined with the need to avoid depreciating the seriousness of the offense, is sufficient in this instance to support the trial court's denial of full probation.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE

-11-